In the Matter of the Estate of JOHN McGRAW, Deceased.

In the Matter of the Estate of JENNIE McGRAW FISKE, Deceased.

The provision of the Revised Statutes limiting the amount of property which incorporated colleges may take and hold by gift, grant or devise (1 R. S. 460, § 36), is not confined to colleges incorporated by the regents of the university under the general laws of the state, but applies also to such an incorporation created by special charter, unless inconsistent provisions are to be found in the charter.

The provisions of the act of 1840 (Chap. 318, Laws of 1840) as amended in 1841 (Chap. 261, Laws of 1841), authorizing the creation of trusts to incorporated colleges, by grants, devises or bequests, do not repeal or affect the general law limiting the amount of property which may be taken and held by such a corporation.

The distinction between the taking and holding of property by corporations recognized in relation to English corporations, subject to the mortmain laws of that country, is not applicable in this state.

Where, in a special charter granted to an institution of learning, a limitation is put upon its power to hold property, in the absence of some plain and controlling circumstance showing a contrary legislative intent, it must be construed as limiting the taking, as well as holding beyond the amount specified; and a devise or bequest to it, exceeding the amount or value it is permitted to take, is void for the excess.

Accordingly *held*, that the provision of the charter of Cornell University (§ 5, chap. 585, Laws of 1865), declaring that the corporation

thereby created might hold property "not exceeding $3,000,000 in the aggregate," prohibited its taking, as well as holding beyond that amount; and, it appearing that the university already held property up to the limit, that a bequest to it was void; also, *held*, that the heirs or next of kin of the testatrix could raise the question.

*Leazure* v. *Hillegas* (7 S. & R. 313); *Baird* v. *Bank of Washington* (11 id. 411); *Goundie* v. *N. W. Co.* (7 Penn. St. 233); *Runyan* v. *Curter* (14 Pet. 122); *Smith* v. *Shelley* (12 Wall. 358); *Bogardus* v. *Trinity Church* (4 Sand. Ch. 633); *Humbert* v. *Trinity Church* (24 Wend. 587); *De Camp* v. *Dobbins* (29 N. J. Eq. 36; *S. C.*, 31 id. 671); *Davis* v. *O. C. R. R. Co.* (131 Mass. 258); *Vidal* v. *Girard's Ex'rs.* (2 How. [U. S.] 127); *In re N. Y. E. R. R. Co.* (70 N. Y. 327); *Moore* v. *B. C. R. R. Co.* (108 id. 98), and other cases holding the doctrine that one who has contracted with or conveyed to a corporation for a consideration will not be heard to raise the question as to its power to take, distinguished.

Also, *held*, that the question was not affected by the fact that subsequent to the death of the testatrix the limitation on the power of said university to take was removed by the legislature.

This state having, by act of its legislature (Chap. 460, Laws of 1863), accepted the grant of land made to it by the act of congress " donating the public lands to the several states and territories which may provide colleges for the benefit of agriculture and the mechanic arts " (Chap. 130, U. S. Laws, 1862) as a compliance on its part with one of the conditions of the grant, chartered said university. In the charter the income, revenue and avails received from the investment of the proceeds of the sale of the land scrip were appropriated to the university and were to be paid over to its trustees. In 1866 the legislature passed an act (Chap. 481, Laws of 1866), authorizing the comptroller to sell the scrip at not less than thirty cents per acre to the trustees of said university; in case said trustees did not contract for the purchase, then the same was to be sold by the commissioners of the land office to any person or persons. The sale in either case to be on condition and under an agreement with the purchaser that the net avails of the sale of the scrip, or of the lands located under it, should be paid over and devoted to the purposes of said university. The trustees having failed to purchase, said commissioners entered into a contract with C. for the purchase by the latter of the scrip then undisposed of. By the agreement C. contracted to purchase at thirty cents per acre, to be paid on delivery of the scrip, to locate and sell the land and pay the net proceeds, less the amount paid, into the state treasury. From such net proceeds it was agreed that a sum equal to an additional thirty cents per acre should be added to and form part of the fund known as the " College Land Scrip Fund," and that the remainder should constitute a separate fund to be known as the " Cornell Endowment Fund," which should " be the property of the Cornell University," the principal thereof to remain forever unimpaired, the income to be

annually appropriated by the legislature and paid over to the trustees of said university. Subsequently, under an agreement between C. and the university, made with the consent of the comptroller and the said commissioners, C. conveyed to the university all the rights and interests he had acquired under the said contract and the university assumed his place. Pursuant to the act of 1880 (Chap. 317, Laws of 1880), directing it, the legislature transferred to the university the moneys and securities constituting the "Cornell Endowment Fund." *Held*, that the agreement between the commissioners and C, was, in effect, a sale by the state of the scrip at thirty cents per acre, with an additional thirty cents, if so much should be realized upon sale by the vendee; and upon the transfer to him he became the legal owner; that the residue of the proceeds agreed to be paid into the state treasury was to be so paid, not as part of the purchase-price, but as profits and as the property of the university; that said agreement was fully authorized by the said act of 1866; that neither said act nor the agreement was in contravention of the act of congress; that the university by the transfer from and its agreement with C., and by receiving the moneys and securities of the Cornell Endowment Fund, by virtue of the act of 1880, became the owner of this fund and was not a debtor of the state on account thereof; and that therefore the property which thus came into the possession of the university was held by it within the meaning of its charter, and so was to be included in estimating the amount of property held by it at the time of the bequest.

(Argued June 11, 1888; decided November 27, 1888.)

APPEAL from judgment of the General Term of the Supreme Court in the fourth judicial department, entered upon an order made August 20, 1887, which reversed a decree of the surrogate of Tompkins county on settlement of the accounts of Douglass Boardman as surviving executor of the will of John McGraw, deceased, and as executor of the will of Jennie McGraw Fiske, deceased. (Reported below, 45 Hun, 354.)

John McGraw, a resident of Ithaca, died May 4, 1877, leaving his only child and heir, Jennie McGraw, who on the 14th day of July, 1880, intermarried with Willard Fiske, and died September 30, 1881, without issue, leaving her husband surviving her.

John McGraw left a last will and testament, which has been duly admitted to probate by the surrogate of Tompkins county, and of which his daughter and Douglass Boardman,

and the survivor of them, were made sole executors. His daughter, Jennie McGraw Fiske, also left her last will and testament, by which she made Douglass Boardman her sole executor, and which has been duly proven and admitted to probate by the surrogate of Tompkins county. Excepting property from about $130,000 to $150,000 in value, which came to her by devise and bequest of her grandfather, John Southworth, the title to the estate and property, which formed the subject of disposition by her will, came through the will of her father, John McGraw.

The will of John McGraw gave $500,000 in trust for his said daughter, and made her residuary legatee, with full power to dispose by will of all the property left by him.

The will of Mrs. Fiske directed that her estate "be converted into money, or available securities, as soon as can be done, having in view its best interests and results." After numerous bequests, among them a bequest to Cornell University of $50,000 in trust, to be expended, so far as necessary, in completing and perfecting the McGraw building of said University; also, to said University $200,000 in trust, to be known as the "McGraw Library Fund," the will contained the following residuary clause: "I give, devise and bequeath all the rest, residue and remainder of my property (if any there shall be) to Cornell University, aforesaid, to be added to the 'McGraw Library Fund' aforesaid, and subject to the trusts, purposes, uses and conditions hereinbefore prescribed for said fund."

The amount of Jennie McGraw Fiske's estate at the time of her death, as found by the surrogate, including the trust fund created under the will of John McGraw, which the surrogate held was part of the estate of John McGraw, but which Mrs. Fiske had a right to dispose of by will, was,

|  |  |  |
|---|---:|---:|
|  | $2,275,933 | 46 |
| Legacies to other than Cornell University, ... | 1,121,570 | 00 |
| Bequests to said University, ........... | 1,154,363 | 46 |

The further material facts are stated in the opinion.

*E. Countryman* and *S. D. Halliday* for appellants. The ancient common law fully recognized the absolute title of the owner of real, as well as of personal, estate, and sustained his right to dispose of his property, real or personal, by deed, devise or bequest. (1 Reeves' Hist. Eng. Law [Finlayson's ed.], 10, note *a;* 19, 78–80, note 1; 73–75, 54, 55, note; 158, 159, 273, 317, 330; Allen's Royal Prerogative, 129, 142, 143; 1 Freeman's Norman Conq. 57, 58, 62–64; 5 id. 247, 248, 250, 253, 256; 2 Hallam's Mid. Ages, 278, 279, note 9; 1 Spence's Eq. Jur. 20, 98, 137, 138, 140, 141, 287, 439–444, 446, 454, 458, 461, 462 and notes, 468, 478, 490, 491; 1 Stubbs' Const. Hist. of Eng. 75, 76, 258–260, 300, 301; 3 Reeves' Hist. Eng. Law, 42, 127–131, note *a;* 138, note *a;* 142 note *a;* 172, note *a;* 172a, 220, note; 274, note *b;* 275, note *a;* 276, note *a;* 279–281, 283, note *c;* 284, 285, note *b;* 286, 361, note *a;* 363; 2 Bl. Com. 48–50; Hale's Hist. Com. Law, 97, 98; Glanville's Law and Cus. of Eng. [Beame's ed.] 138–142; Mirror of Just. chap. 1, § 3; 2 Reeves' Hist. Eng. Law, 74, 77, 129, 200, 201, 252, 253; 286, note *b; Jackson* v. *Schultz,* 18 Johns. 185; 2 Hume's Hist. of Eng. 297, 512; 1 Froude's Hist. of Eng. 21; Hume's Hist. of Eng. chap. 23, 511, 512; chap. 26, 596; *Jones* v. *Morley,* 1 Ld. Ray. 291; Gilbert on Uses [Introduction by Sir Edward Sugden], 43–46; *Wright* v. *Trustees of M. E. Church,* Hoff. Ch. 252.) At common law there was no limitation of the capacity of corporations to acquire and own real or personal estate. (1 Bl. Com. 475, 478, 479; Shelf. on Mortmain, 27; 1 Kyd. on Corp. 78, 103, 104; Grant on Corp. 98, 100; Angell on Corp. [11th ed.] §§ 110, 145; 2 Kent's Com. 281; *Page* v. *Heineberg,* 40 Vt. 81; *People* v. *La Rue,* 67 Cal. 526, 531; *Sherwood* v. *American Bible Society,* 4 Abb. Ct. App. Dec. 227; *Thompson* v. *Waters,* 25 Mich. 227.) The English statutes of mortmain related merely to real property. The provisions of these acts did not extend to Scotland or Ireland, nor to any of the colonies. (2 Kent's Com. 282; Angell on Corp. [11th ed.] §§ 143, 149; Shelf. on Mortmain, 122; *Atty-Gen.* v. *Stewart,* 2 Mer. 148, 161; *Fordyce* v. *Bridges,*

2 Phill. 515; *Chamberlain Case*, 43 N. Y. 424, 434; *Despard* v. *Churchill*, 53 id. 192; *Vansant* v. *Roberts*, 3 Md. 119, 129; *Perin* v. *Carey*, 24 How. [U. S.] 466; *Odell* v. *Odell*, 10 Allen [Mass.], 6; *Potter* v. *Thornton*, 7 R. I. 252; *Page* v. *Heineberg*, 40 Vt. 81.) The mortmain acts have never been accepted as law in New York, nor probably in any other state, except partially in Pennsylvania. (2 Kent's Com. 283; *Bascom* v. *Albertson*, 34 N. Y. 584; Angell on Corp. [11th ed.] § 149; 3 Washb. on Real Prop. [4th ed.] 267; Green's Brice's Ultra Vires, 11, note *a*.) The several states have adopted restrictions which have been regarded as mortmain restrictions. (*Downing* v. *Marshall*, 23 N. Y. 386, 387.) All the powers of the court in relation to licenses, escheats and forfeitures devolved to the states. (Laws of 1879, chap. 25, § 13; Laws of 1887, chap. 36, § .5; Laws of 1792, chap. 35, §§ 5–7.) The state became the original source of title and the ultimate owner of all land to which the title failed from any cause. (1 R. S. 718, § 1; *Ogden* v. *Lee*, 6 Hill, 546; 5 Denio, 628.) The gift to the university is valid, unless there is a prohibition in the charter. (2 R. S. 57, § 3; 1 id. 599, § 1; *Sherwood* v. *Am. Bible Soc.*, 4 Abb. Ct. App. Dec. 231; *Hall* v. *Hall*, 81 N. Y. 131, 134, 135–137; *Stamm* v. *Bostwick*, 40 Hun, 38; Laws of 1840, chaps. 267, 318, §§ 1, 4; Laws of 1841, chaps. 245, 261; *Cottman* v. *Grace, Mayor, etc.*, 2 N. Y. State Rep. 630, 633; *Smith* v. *People*, 47 N. Y. 330, 339; *In re Rochester*, 66 id. 414, 422; *Whipple* v. *Christian*, 80 id. 523, 527.) The gift to the university for the purpose of maintaining a library, however, would not come within the provisions of the Revised Statutes against perpetuities, even if the acts of 1840 and 1841 had not been passed. (*Wetmore* v. *Parker*, 52 N. Y. 450, 458.) These provisions of the Revised Statutes, it is well settled, gave the university power to hold property, if obtained in any other manner than by devise, for any purpose germane to the accomplishment of the general objects of its incorporation. (2 Kent's Com. 280; 2 Dill. on Mun. Cor. [3d ed.] § 567; *Barnum* v. *Baltimore*,

62 Md. 293; *Vidal* v. *Girard's Exrs.*, 2 How. [U. S.] 127; *McDonald's Exrs.* v. *Murdoch*, 15 id. 367; *Perine* v. *Cary*, 24 id. 465.) A corporation may acquire and hold lands for purposes which are incidental or auxiliary to its main objects, and, therefore, may hold such lands for sale with the view of increasing its funds. (*Swan Point Cem.* v. *Tripp*, 14 R. I. 199; *New Shorman* v. *Ball*, Id. 566, 567; *Sargent* v. *Cornish*, 54 N. H. 18.) As the prohibition in the Revised Statutes against a corporation taking by devise does not declare the conveyance void as in the case of an alien; it might be argued that the university, by the act of incorporation, became *ipso facto* capable of taking, so that the title would vest subject to the right of the state to declare a forfeiture for a violation of the statute. (*McManus* v. *Gavin*, 77 N. Y. 36; *Burnside* v. *Whitney*, 21 id. 149; *Bonnell* v. *Griswold*, 80 id. 128.) The language used in the charter having a definite meaning is not open to judicial construction for the purpose of limiting or extending it. (*Johnson Case*, 49 N. Y. 455; *McCluskey Case*, 11 id. 593, 601, 602; *Benton Case*, 54 id. 226.) The enactment of a statute, subsequent to the Revised Statutes, designating a number or class of corporations who might take by devise for particular purposes had the effect of repealing, to that extent, the prior prohibition against taking in that manner. (*White* v. *Howard*, 46 N. Y. 164; *Hall* v. *Hall*, 81 id. 131, 136.) The university, therefore, could take the entire residue given in the will, regardless of the charter limitation, but it could only hold any excess over such limit with the consent of the state. (*Runyan* v. *Coster*, 14 Pet. 122, 130; *Baird* v. *Bk. of Washington*, 11 S. & R. 411; *Barrow* v. *Turnpike Co.*, 9 Humph. [Tenn.] 303; *Leazure* v. *Hillegas*, 7 S. & R. 313; 1 Perry on Trusts, § 45; 3 Wash. on Real Prop. [4th ed.] 267; *Smith* v. *Sheely*, 12 Wall. 358; *Alexander* v. *Tolleston Club*, 110 Ill. 65; *Hough Case*, 73 id. 23; *Baker* v. *Neff*, 73 Ind. 68; *Lewis Case*, 53 Iowa, 110, 113; *Bushnell Case*, 11 Neb. 192, 195; *Jones* v. *Habersham*, 107 U. S. 175, 188; *De Camp* v. *Dobbins*, 29 N. J. Eq. 36, 41; *Bogardus* v *Trinity Church*, 24 Wend. 630; *Christian*

*Union* v. *Yount*, 101 U. S. 353 ; *Whitney* v. *Wyman*, Id. 392, 396, 397 ; *Nat. Bk.* v. *Matthews*, 98 id. 621, 629 ; *Nat. Bk.* v. *Whitney*, 103 id. 99, 102 ; *Fortier* v. *N. O. Bk.*, 112 id. 440 ; *Crocker* v. *Whitney*, 71 N. Y. 161, 170 ; *Eaton* v. *Aspinwall*, 19 id. 119 ; *Buffalo, etc., Co.* v. *Cary*, 26 id. 75 ; *Cayuga, etc., R. R. Co.* v. *Kyle*, 64 id. 185 ; *Whilford* v. *Laidler*, 94 id. 146, 151.)  There is a broad distinction between a prohibition against taking, or taking and holding, and a prohibition merely against holding property above a stated amount. (Angell on Corp. § 152 ; Shelford on Mortmain, 2, 8, 27, 34–40, 244 ; 1 Kyd on Corp. 79 ; 1 Coke on Littleton, 2b. 99a. 98b. ; Grant on Corp. 100, 101, 102, 103, 104, 132, 133 ; 2 Black. Com. 272, 273 ; Wilmot's Opinions, 9, 10 ; Ambler's Rep. 550, 571 ; *Atty-Gen.* v. *Bowyer*, 3 Ves., Jr. 714 ; 2 Fitz. Nat. Brev. 221*O*, 224 *H* ; *Hargraves* v. *Butler*, note, No. 108, to Coke's Littleton ; 1 Powell on Devises, 165, 166 ; Lovelass on Wills, 256 ; *Flood's Case*, Hob. R. 136 ; *King* v. *Newman*, 1 Lev. 284 ; *Christ's College Case*, 1 W. Black. 91 ; *Corpus Christie College* v. *Bishop of London*, 2 id. 1182, 1183.)  At common law an alien had the capacity to take a fee, but he could not hold it without a license as against the crown. (1 Co. Litt. 2b. ; Com. Dig., Aliens, c. 2 ; 1 Bac. Abr., Aliens, c. ; *Wright* v. *Sadler*, 20 N. Y. 320, 324 ; *People* v. *Conklin*, 2 Hill, 67 ; *Governeur* v. *Robertson*, 11 Wheat. 332 ; *Fairfax* v. *Hunter*, 7 Cranch, 602, 603, 619, 621 ; *Wadsworth Case*, 12 N. Y. 376 ; *Maynard* v. *Maynard*, 36 Hun, 227 ; *In re Malone*, 21 S. C. 436.)  If the trust was valid in point of law, neither the heirs of the testator nor any other private persons could have any right to inquire into or contest the right of the corporation to take the property or to execute the trust ; this right would exclusively belong to the state in its sovereign capacity, and in its sole discretion, to inquire into and contest the same by *quo warranto* or other judicial proceedings.  ( *Vidal* v. *Girard's Exrs.*, 2 How. [U. S.] 127, 192 ; *McConihay* v. *Wright*, 121 U. S. 201, 215 ; *Baker Case*, 36 Minn. 185 ; *Land* v. *Coffman*, 50 Mo. 243, 254 ; *Hickey Case*, 32 Fed. Rep. 22 ;

*Barnes* v. *Suddard*, 117 Ill. 238 ; *Hayward* v. *Davidson*, 41 Ind. 213, 215 ; *Sheewalter* v. *Panier*, 55 Mo. 219, 233, 234 ; *Girard* v. *Philadelphia*, 7 Wall. 1, 14 ; *Chambers* v. *St. Louis*, 29 Mo. 543, 576, 577 ; *Cal. Tel. Co.* v. *Alta. Tel. Co.*, 22 Cal. 398, 430 ; *Bybee* v. *Oregon, etc., R. Co.*, 26 Fed. Rep. 586 ; *Christian Union* v. *Yount*, 101 U. S. 353, 361 ; *Cowell* v. *Springs Co.*, 100 id. 56, 60 ; *DeCamp* v. *Dobbins*, 2 N. J. Eq. 40 ; *Mallett* v. *Simpson*, 94 N. C. 37, 41 ; *Grundie* v. *Northampton Co.*, 7 Penn. 233 ; *Hough* v. *Cook Land Co.*, 73 Ill. 23 ; *Banks* v. *Portiaux*, 3 Rand. [Va.] 136 ; *In re El. R. R. Co.*, 70 N. Y. 327, 338 ; *People ex rel. Murphy* v. *Kelly*, 76 id. 476, 487.) The maintenance of a university library is one of the purposes comprehended in the general objects of the charter. (*Mich. U.* v. *Detroit Y. M. Soc.*, 12 Mich. 161 ; *Exrs. of McDonough* v. *Murdock*, 15 How. [U. S.] 367 ; *Vidal* v. *Girard's Exrs.*, 2 id. 127 ; *Perin* v. *Carey*, 24 id. 465 ; *Jones* v. *Habershaw*, 107 id. 175, 189 ; *Maynard* v. *Woodward*, 36 Mich. 423, 427.) In the absence of proof it will be presumed that a corporation holds real estate for the purposes permitted, and in pursuance of the powers granted in its charter. (*Farmer's Loan Co.* v. *Curtis*, 7 N. Y. 466 ; *Chautauqua Co. Bk.* v. *Risley*, 19 id. 370, 380–382 ; *Ex parte Peru Iron Co.*, 7 Cow. 540 ; *Regents of University* v. *Detroit Y. M. Soc.*, 12 Mich. 139, 159 ; *Yates* v. *Van DeBogert*, 56 N. Y. 526.) Independently of the acts of 1840 and 1841, there being no statutory prohibition against acquiring personal property in any manner, the university could take title by bequest without limit for any of the purposes of its incorporation. (*Sherwood Case*, 4 Abb. App. Dec. 227, 231 ; Green's Brice's Ultra Vires, 10 ; Grant on Corp. 98.) Any corporate contract or proceedings in excess of its power or authority, does not affect the validity of the title or of the act as between the parties. (*Indiana* v. *Woram*, 6 Hill, 33, 37 ; *Howell* v. *Earp*, 21 Hun, 395 ; *Wilson* v. *Furness R. Co.*, L. R., 9 Eq. Cas. 34 ; *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 63 ; *Bissell* v. *Mich., etc., R. Co.*, 22 id. 258, 259 ; *Parish* v. *Wheeler*, Id. 494 ; *Ellsworth* v. *St Louis, etc., R. Co.*, 98 id.

553 ; *At. State Bk.* v. *Savery*, 82 id. 292, 307 ; *Rider, etc., Co.* v. *Roach*, 97 id. 378, 382 ; *Ayres Case*, L. R., 3 P. C. 548, 558, 559 ; *Camden, etc., R. R. Co.* v. *Mays Landing, etc., R. Co.*, 48 N. J. Law, 530 ; 2 Morawetz on Corp. §§ 648–660 *et seq ; Lent* v. *Howard*, 89 N. Y. 169, 177.) As the title therefore vested in the university under the will, the state could waive its sovereign right of escheat for a violation of the charter in holding more than the legal limitation, and could extend or remove the limitation and confirm the corporate title. (*State* v. *Turnpike Company*, 15 N. H. 162 ; Laws of 1882, chap. 133, § 2 ; *Wadsworth's Case*, 12 N. Y. 379 ; *In re Trustees of P. E. School*, 31 id. 575, 588, 589 ; *Vidal* v. *Girard's Exrs.*, 2 How. [U. S.] 191.) At common law the real estate of a corporation reverted to the grantors, or their heirs, in case of a dissolution. (1 Black. Com. 484 ; Coke's Inst. 13 b ; *Atty.-Gen.* v. *Gower*, 9 Mod. 226 ; Grant on Corp. 301, 303, 304 ; 2 Morawetz, § 1031 ; *Yates* v. *Van De Bogert*, 56 N. Y. 526 ; *Nicoll Case*, 12 id. 121 ; *People* v. *Moran*, 5 Denio, 389 ; *Vail Case*, 106 N. Y. 283, 287 ; *Paige* v. *Heineburg*, 40 Vt. 81 ; *Heath* v. *Barmore*, 50 N. Y. 302 ; 1 R. S. 600, §§ 9, 10 ; *Owen* v. *Smith*, 31 Barb. 407 ; *Tower* v. *Hale*, 46 id. 361 ; *Kenny* v. *Wallace*, 24 Hun, 479 ; *Sweet Case*, 79 N. Y. 293 ; *Heywood Case*, 7 id. 217 ; *Armstrong Case*, 45 id. 234 ; *Rexford* v. *Knight*, 11 id. 308 ; *Beal Case*, 41 Hun, 173 ; *Tower* v. *Hale*, 46 Barb. 361 ; *Sanderson* v. *White*, 18 Pick, 328.) The word " hold " is used in the charter in the sense of " own." (1 Abb. Law Dict. 565 ; *Godfrey* v. *Godfrey*, 17 Ind. 6–9.) The United States is a body politic and corporate, and as such is capable of contracting. (*U. S.* v. *Maurice*, 2 Brock. 96, 109, 110 ; *U. S.* v. *Tingey*, 5 Pet. 114 ; *U. S.* v. *Bradley*, 10 id. 343 ; *U. S.* v. *Hodson*, 10 Wall. 395, 407 ; *U. S.* v. *Linn*, 15 Pet. 290, 311.) The same principle applies to the state. (*Danolds* v. *State*, 89 N. Y. 37, 44 ; *People* v. *Stephens*, 71 id. 527.) The grant by the United States to the state upon conditions, and the acceptance of the grant by the state constituted a contract. (*McGee* v. *Mathis*, 4 Wall. 143, 155 ; *Chicago,*

*etc.*, *R. R. Co.* v. *Auditor General*, 53 Mich. 79, 91.) The contract, being valid, created a trust, setting apart a permanent fund for educational purposes. (*Barrings* v. *Dabney*, 19 Wall. 1, 9 ; *Swan* v. *Lindsey*, 70 Ala. 520 ; *Comrs. of Sinking Fund* v. *Walker*, 7 Miss. 143, 184 ; 1 Perry on Trusts, §§ 28, 30, 40, 41, 287 ; *Equitable Trust* v. *Fisher*, 106 Ill. 189 ; *U. S.* v. *Hall*, 98 U. S. 357, 358 ; *Exrs. McDonough* v. *Murdoch*, 15 How. [U. S.] 367, 415 ; *Milford* v. *Reynolds*, 1 Phila. 185, 194.) The trust in this case is not subject to the laws for the regulation of trusts in this state. (*Odell* v. *Odell*, 10 Allen, 1 ; *Exrs. of McDonough* v. *Murdoch*, 15 How. [U. S.] 367 ; *Perin* v. *Carey*, 24 id. 466 ; *Vidal* v. *Girard's Exrs.*, 2 id. 127 ; *Magdalen College* v. *Attorney-General*, 6 H. of L. Cas. 189 ; *Philpot* v. *St. George's Hospital*, 6 id. 338.) The courts will regulate and control such a special trust, whether the fund is derived from individuals, the crown, the state or the nation, and enforce its provisions according to law. (2 Perry on Trusts, § 707 ; *Barnum* v. *Baltimore*, 62 Md. 277, 298, 299 ; *People* v. *Canal Board*, 55 N. Y. 390 ; 2 Dillon's Mun. Corp. §§ 567, 909.) The legal title to the trust property vested, under the grant, in the state, as trustee, for the particular purposes specified. (*Shulenburg* v. *Harriman*, 21 Wall. 44, 60, 62 ; *Leavenworth, etc., R. Co.* v. *U. S.*, 92 U. S. 733, 741 ; *M., etc., R. R. Co.* v. *K., etc., R. R. Co.*, 97 id. 491, 496, 497 ; *R. R. Co.* v. *Baldwin*, 103 id. 426, 429 ; *Wood* v. *R. R. Co.*, 104 id. 329, 332 ; *Van Wyck* v. *Knevals*, 106 id. 360, 365 ; *Rutherford* v. *Greene*, 2 Wheat. 196 ; *St. P., etc., R. R. Co.* v. *Greenhalgh*, 26 Fed. Rep. 563 ; *Wright* v. *Rosebury*, 121 U. S. 488 ; *Donovan* v. *Van De Morle*, 78 N. Y. 247 ; *Harris* v. *A Bible Soc.*, 2 Abb. Ct. App., Dec. 320 ; *Brewster* v. *Striker*, 2 N. Y. 19, 31 ; *Hathaway* v. *Hathaway*, 37 Hun, 265 ; *Leggett* v. *Leggett*, 2 N. Y. 297, 305 ; *Adams* v. *Perry*, 43 id. 487, 497 ; *Marx* v. *McGlynn*, 88 id. 375, 376 ; *Goodrich* v. *Milwaukee*, 24 Wis. 422, 431 ; *Devin* v. *Hendershott*, 32 Iowa, 194 ; *Neilson* v. *Logan*, 12 How. [U. S.] 98, 107 ; *W. R. R. Co.* v. *Nolan*, 48 N. Y. 513, 517 ; *Bennett* v *Gar-*

*lock*, 79 id. 302; *Bramhall* v. *Ferris*, 14 id. 46; *Eq. Trust
Co.* v. *Fisher*, 106 Ill. 189, 195.)   The act of Congress, being
the original source and only authority for the existence of the
trust, it is also the exclusive warrant for all power to act or
right to exercise control over the property. (*Eq. Trust Co.*
v. *Fisher*, 106 Ill. 195; *Barber* v. *Cary*, 11 N. Y. 397; *Kis-
sam* v. *Dierkes*, 49 id. 602.)   The duties and powers of trus-
tees cannot be delegated to others, unless there is express
authority for that purpose given in the instrument creating
the trust.   (1 Perry on Trusts, §§ 287, 402; *Diefendorf* v.
*Spraker*, 10 N. Y. 246, 250; *Thatcher* v. *Candee*, 4
Abb. Ct. App. Dec. 387; *Cruger* v. *Halliday*, 11 Paige, 314,
319; *Brennan* v. *Wilson*, 71 N. Y. 502, 506.)   Nor can
the trustee, where the trust is created for a specific purpose,
even with the consent of the *cestui que trust*, divert the
property from the appointed purpose.. (1 Perry on Trusts,
§ 386, note *a ; Dunham* v. *Milhaus*, 70 Ala. 596; *Loving*
v. *Brodie*, 134 Mass. 453, 459 ; *Isham* v. *Del., etc., R. R. Co.*,
11 N. J. Eq. 227; *Lee* v. *Horton*, 104 N. Y. 541, 542; *Wet-
more* v. *Porter*, 92 id. 77; *Story* v. *N. Y. El. R. Co.*, 90 id.
124, 157; *Watertown* v. *Cowen*, 4 Paige, 510; *Hunter* v.
*Sandy Hill*, 6 Hill, 407, 412; *Adams* v. *S., etc., R. R. Co.*,
11 Barb. 414, 450; *Barclay* v. *Howell*, 6 Peters, 498; *Warren*
v. *Lyons*, 22 Iowa, 351; *Hellman* v. *Mc Williams*, 70 Cal. 449 ;
*Broadway Nat. Bk.* v. *Adams*, 133 Mass. 170; *Nickols* v.
*Eaton*, 91 U. S. 716; *Hyde* v. *Woods*, 94 id. 523; *Wetmore* v.
*Truslow*, 51 N. Y. 338; *Locke* v. *Mabbett*, 3 Abb. Ct. App. Dec.
69.)   The courts have no power to destroy or impair a valid
trust before the term of its limitation, nor to authorize the
fund to be alienated or diverted from its proper purpose or
custody. (*Douglas* v. *Cruger*, 80 N. Y. 15; *Lent* v. *Howard*,
89 id. 171, 181; *Harvard College* v. *Society, etc.*, 3 Gray, 280,
301.)   And an act of the legislature will be equally ineffectual
to accomplish such a result. (*Stone* v. *Framingham*, 109
Mass. 303; *Shulenburg* v. *Harriman*, 21 Wall. 59, 64; *Swan*
v. *Lindsey*, 70 Ala. 507, 521; *Barrings* v. *Dabney*, 19 Wall.
1, 9.)   Even the United States as donor cannot revoke the

trust or resume title to or control of the fund, without the consent of all the parties in interest, except for a forfeiture of conditions in the grant. (1 Perry on Trusts, § 104; *Gilchrist* v. *Stevenson*, 9 Barb. 9, 15; *Isham* v. *D., etc., R. R. Co.*, 11 N. J. Eq. 227; *Adams* v. *S., etc., R. R. Co.*, 11 Barb. 414, 450; *Cincinnati* v. *White*, 6 Peters, 432; *Van Wyck* v. *Knevals*, 106 U. S. 360.) Nor can the trustee by any act of his own divest himself of or convey away the legal title to the fund, particularly to persons having knowledge or notice of the trust. (*Gilchrist* v. *Stevenson*, 9 Barb. 9, 15; *Isham* v. *D., etc., R. R. Co.*, 11 N. J. Eq. 227; *Reid* v. *Bank of Mobile*, 70 Ala. 199; *Swan* v. *Lindsey*, Id. 507, 521; *Lee* v. *Horton*, 104 N. Y. 451; *Wetmore* v. *Porter*, 92 id. 77; *Stockton* v. *Newark*, 42 N. J. Eq. 531; *Pierce* v. *Weaver*, 65 Tex. 45; *Shulenburg* v. *Harriman*, 21 Wall. 45, 59; *Farnsworth* v. *Minn., etc., R. R. Co.*, 92 U. S. 50, 65; *Swan* v. *Miller*, 82 Ala. 530; *Dow* v. *Berry*, 18 Fed. Rep. 121; *Smith* v. *Bowen*, 35 N. Y. 83; *Zimmerman* v. *Kinkle*, 13 State Rep. 634; 108 N. Y. 282; 1 Perry on Trusts, §§ 38, 334, 346; *Cruger* v. *Jones*, 18 Barb. 467; *Douglas* v. *Cruger*, 80 N. Y. 15, 19; *Johnson* v. *Towsley*, 13 Wall. 72, 85; *Lindsey* v. *Hawes*, 2 Black, 554, 558; *South Pac., etc., R. R. Co.* v. *Dull*, 22 Fed. Rep. 490, 498; *Winona, etc., R. R. Co.* v. *St. Paul, etc., Co.*, 26 Minn. 179, 182; *Cunningham* v. *Ashley*, 14 How. [U. S.] 338; *White* v. *Douglas*, 71 Cal. 116.) Considered in the light of these principles, the legal title to and the ownership of the trust fund is still in the state of New York. (*People* v. *Stephens*, 71 N. Y. 527, 549, 550; *Danold's Case*, 87 id. 37, 44; Laws of 1866, 1060, § 1; *Sage* v. *Board of Liquidation*, 37 La. Ann. 413, 414.) The subsequent transfer of the property thus acquired by Mr. Cornell, together with all his rights and liabilities under his contracts with the state, with the consent of the state authorities, to the university, does not change the legal aspect of the case. (*Wetmore* v. *Parker*, 52 N. Y. 451; *Chamberlain Case*, 43 id. 425.) Nor did the act of the legislature of 1880 effect a transfer of the title of the trust property

to the university, or relieve the latter from its liability for the purchase-price of the scrip. (*Leavenworth, Gal., etc., R. R. Co. v. U. S.*, 92 U. S. 733, 740; *D., etc., R. R. Co.* v. *Litchfield*, 23 How. [U. S.] 66, 88; *Charles R. Bridge* v. *Warren Bridge*, 11 Pet. 421, 545; *Sidell* v. *Granjean*, 111 U. S. 413, 437, 438; *Rice* v. *R. R. Co.*, 1 Black, 359, 374; *Patterson* v. *Winn*, 11 Wheat. 380, 384; *Polk* v. *Wendell*, 9 Cranch, 87, 101; 5 Wheat. 293, 303; *Jackson* v. *Lawton*, 10 Johns. 23.) Congress could not repeal the act of 1862, so as to divest the interest of the state, without its consent. (*Terrett* v. *Taylor*, 9 Cranch, 43, 50; *Powlet* v. *Clark*, 9 id. 292, 332, 336; *Vincennes University* v. *Indiana*, 14 How. [U. S.] 269, 274; *Home of Friendless* v. *Rouse*, 8 Wall. 431, 436, 440; *Farrington* v. *Tennessee*, 95 U. S. 679, 683; *Wood* v. *Burnham*, 6 Paige, 518; affirmed, 26 Wend. 19; 1 Perry on Trusts, § 359; *Fletcher* v. *Peck*, 6 Cranch, 87, 135; *Curran* v. *Arkansas*, 15 How. [U. S.] 304; *Van Hoffman* v. *Quincy*, 4 Wall. 535; *Barrings* v. *Dabney*, 19 id. 1, 10.) The most beneficial clause in the charter conferring the right to the income from the trust fund cannot, therefore, be repealed or altered without the concurrence of the university. (*Assessors* v. *Morris, etc., R. R. Co.*, 49 N. J. Law, 193; *Dartmouth College* v. *Woodward*, 4 Wheat. 518; *Woodruff* v. *Trapnall*, 10 How. [U. S.] 190; *Curran* v. *Arkansas*, 15 id. 304; *State Bank* v. *Knoop*, 16 id. 369; *Dodge* v. *Woolsey*, 18 id. 331; *Jefferson Bank* v. *Skelly*, 1 Black, 436; *Vincennes University* v. *Indiana*, 14 How. [U. S.] 269; *McGee* v. *Mathis*, 4 Wall. 143; *Home of Friendless* v. *Rouse*, 8 id. 431; *Wash. University* v. *Rouse*, 8 id. 440; *Barrings* v. *Dabney*, 19 id. 1, 9, 10; *Farrington* v. *Tennessee*, 95 U. S. 683; *Canal, etc., Co.* v. *Tedesco*, 37 La. Ann. 100.) It is apparent, from the charter of the university, read in connection with the act of congress, that no part of the National Trust Fund was reckoned or included as a part of the $3,000,000, to which its capacity to hold property was restrained and limited. (Laws of 1865, chap. 585, § 6; *Brick* v. *Gannon*, 36 Hun, 52; *People* v. *Wood*, 71 N. Y. 371; *Jones* v. *Sheldon*, 50 id. 477; *Ingham*

v. *Dudley*, 60 Iowa, 16, 23; Angell on Corp. § 145; *North Hempstead* v. *Hempstead*, 2 Wend. 109; *Gospel Soc.* v. *Powlet*, 4 Pet. 480.)

*Esek Cowen* and *George F. Comstock* for respondents. Neither the husband nor the heirs-at-law of Mrs. Fiske were precluded from raising the question that the devises to the Cornell University were void or ineffectual by the fact that they had accepted their legacies under the will. Their acts created nothing in the nature of an estoppel. (*Hawley* v. *James*, 16 Wend. 142; *Noyes* v. *Mordaunt*, 2 Vern. 581; *Blake* v. *Banbury*, 1 Ves. 523; *Downing* v. *Marshall*, 23 N. Y. 366.) If, at the date of the death of Jennie McGraw Fiske, on the 30th of September, 1881, Cornell University was possessed of property to the amount of $3,000,000 or more, it was incapable of receiving the attempted devise in her will, the title to the property did not vest in the university, and it descended to her heirs-at-law and next of kin, as in case of intestacy. (*Chamberlain* v. *Chamberlain*, 43 N. Y. 424; *Leazure* v. *Hillegas*, 7 S. & R. 313; *Baird* v. *Bk. of Washington*, 11 id. 411; *Runyan* v. *Coster*, 14 Pet. 122; *Bank* v. *Matthews*, 98 U. S. 62, 621; *Bank* v. *Whitney*, 103 id. 99; *Fortier* v. *N. O. Bk.*, 112 id. 240; *Bissell* v. *R. R. Co.*, 22 N. Y. 260; *Parish* v. *Wheeler*, Id. 494; *Whitney Arms Co.* v. *Barlow*, 63 id. 62; *Bk. of Mich.* v. *Niles*, 1 Doug. [Mich.] 401; *P. R. R. Co.* v. *Seeley*, 45 Mo. 212; *Crispell* v. *Dubois*, 4 Barb. 397; *Lynes* v. *Townsend*, 33 N. Y. 561; *McCarty* v. *Orphan Asylum*, 9 Cow. 437; *Baker* v. *Clark Institute*, 110 Mass. 88; *White* v. *Howard*, 45 N. Y. 144; *Goddard* v. *Pomeroy*, 36 Barb. 546; *Leslie* v. *Marshall*, 31 id. 561; *Ayres* v. *M. E. Church*, 2 Sand. Sup. Ct. 351.) The land grant from the United States, appropriated to Cornell University by its charter, in consideration of a payment of $525,000 by Ezra Cornell, is to be reckoned as part of the $3,000,000 which the university was permitted by its charter to hold. (*Bogardus* v. *Trinity Church*, 4 Sandf. Ch. 642.) The land grant fund, now in the hands of the state for the

purpose of investment, the whole income of which belongs exclusively to Cornell University, within the meaning of the fifth section of its charter, and is to be included in the $3,000,000, to which amount the right of the corporation to hold real or personal property is thereby limited. (*Steif* v. *Hart*, 1 N. Y. 20; 2 R. S. chap. 2, §§ 22, 28; *People* v. *Mayor of Brooklyn*, 9 Barb. 564; *Hollis* v. *Drew Theological Sem.*, 95 N. Y. 166.) The gift or grant of the income or produce of personal property, in perpetuity or without any limitation in favor of others, is a gift or grant of the *corpus* of the fund, which produces the income and vests the income of the fund in the donee or grantee. (*Mason's Exrs.* v. *Trustees of M. E. Church*, 27 N. J. Eq. 47; *Haig* v. *Swiney*, 1 S. & S. 489; *Adamson* v. *Armitage*, 19 Ves. 418; *Page* v. *Leapingwill*, 14 id. 463; *Gulick* v. *Gulick*, 27 N. J. Eq. 498; *McMichael* v. *Hunt*, 83 N. C. 344; *Fox* v. *Carr*, 16 Hun, 566.) When the state, for a valuable consideration parted with by Ezra Cornell, granted to Cornell University the sole and exclvsive right to receive the income and avails of this fund forever, it granted to the university not only the income, but the absolute property in the fund, subject only to the duty of the state, to invest it, collect the income and proceeds and pay them over to the university. (*Morrison* v. *Semple*, 6 Bin. 94; *Jackson* v. *Hounsel*, 17 Johns. 283; *Lawrence* v. *Lawrence*, 1 Edw. 258; *Baird* v. *Bk. of Wash.*, 11 S. & R. 411; *Coleman* v. *R. R. Co.*, 49 Cal. 517; Hill on Trustees, 52, 53; Perry on Trusts, §§ 63–65.) There is nothing in the act of congress creating the land grant fund, which by express provision or necessary implication makes the several states, to which it was given, the perpetual custodians of the fund, and the state of New York had the legal right to vest the title to the whole or any part of such fund, in any corporation which it might designate as the beneficiary thereof, coming within the description of the act of congress. (Perry on Trusts, §§ 297, 920; *Inches* v. *Hill*, 106 Mass. 575; *Smith* v. *Harrington*, 4 Allen, 566; *Bowditch* v. *Andrew*, 8 id. 339; *Taylor* v.

*Huber*, 13 Ohio St. 288; *Short* v. *Wilson*, 13 Johns. 33; *Passingham* v. *Sherborne*, 9 Beav. 424; *Reid* v. *Reid*, 30 id. 388; *Ex parte Chitton*, 21 Eng. L. & Eq. 186; *R. R. D. Church* v. *Mott*, 7 Paige, 80.) The state had a right to term- inate its trust and transfer the fund to the only party which had a beneficial interest in it, and the validity of the transfer was not affected by any illegal and ineffectual consent on the part of the state, that the university might use the income for a purpose not contemplated by congress. (Perry on Trusts, 849, 851; Hill on Trustees, 525, 526, 579; *Fyler* v. *Fyler*, 3 Beav. 560; *Walker* v. *Symond*, 3 Swan., 64.) A convey- ance in breach of the trust, to a stranger, not being void, a *fortiori* it is not void, when made directly to the *cestui que trust*. At the most it would only be voidable at the suit of a proper party. (Perry on Trusts, §§ 334, 336, 849.) The only other remedy against a breach of trust, in this class of cases, is at the suit of the attorney-general of the state, or of the United States. (Perry on Trusts, § 744.) No court of equity can intervene and compel the state to assume control of this Cornell endowment fund, so that the transfer to the trustees of the university, not being void, and no court or other power existing can avoid it, the legal title like the equitable interest, is perpetually vested in the university. (*Atty.-Gen.* v. *Fish- mongers' Co.*, 5 Myl. & Cr. 16; *Atty.-Gen.* v. *Smithies*, 2 R. & M. 749; *People* v. *Stephens*, 71 N. Y. 536.) The assignee of the state being permitted to locate the lands, the assignment of the scrip by the state was equivalent to a grant of the lands by congress to the assignee and vested in him the legal title to the lands to be thereafter located. (*Swan* v. *Lindsay*, 70 Ala. 521.) The title of a corporation to all its principal, is, in one sense defeasible, that is, its title may be defeated by the expira- tion or destruction of its charter. But it does not take a defeasible title to the specific land which its charter forbids it to hold. It either takes no title or it takes a title as absolute as a corporation can take with regard to any property, namely, a title that continues during its own existence. If its charter is annulled, even then the land does not go to the state, but

reverts to its original owners. (*Nicoll* v. *N. Y. & E. R. R. Co.*, 12 N. Y. 121.) The courts of this state will not make themselves *particeps criminis* with the corporation in a violation of the law of the land, for which the corporation can be punished by the annulment of its charter. (*De Camp* v. *Dobbin*, 31 N. J. Eq. 671.)

PECKHAM, J. The question to be decided in this case is whether Cornell University or some other parties, being the residuary legatees, or else the heirs-at-law or next of kin of John McGraw, deceased, or of Jennie McGraw Fiske, deceased, or her husband, shall have the property, or any portion of it, bequeathed to the university by the will of Mrs. Fiske. In case the university should be held not to be a competent legatee, the question as to where the property shall go is, as we understand, a matter in which the various parties to the litigation have agreed, and hence the only question we need consider is, first, in regard to the capacity of the corporation to take the legacy. If that should be decided in the affirmative, it would be necessary to discuss no other question. If, however, it should be held that the corporation had no power to take and hold more than $3,000,000, the second question would be as to whether it was the owner and holder of such an amount at the time of the decease of Mrs. Fiske. Both of these questions are important and worthy of the most careful and deliberate consideration. The case involves a very large amount of property, and involves, also, the decision of a question as to the effect of the general statutes relating to the acquisition and holding of property by corporations of the class of this university, as the same have been affected by the terms of the special charter granted to it.

The case has been most elaborately and ably argued by counsel on both sides, and the written briefs submitted to the court by them bear conclusive evidence of the thoroughness and extent of their researches into the English law on the subject of mortmain and its results, as well as that of our own and of the other states of the union.

To examine and comment upon each argument advanced, and to go through the long list of cases cited in this and other states and in England, would render this opinion of immoderate length and would not probably be of any great service. We must be content to give the conclusion at which we have arrived, together with the reasons which seem to us controlling, in as short a space as it reasonably may be done.

*First.* Coming to a discussion of the first question, it may be assumed that a corporation, by the common law, had power to take property by devise. (*Sherwood* v. *American Bible Society,* 4 Abb. Ct. of App. Dec. 227, 231; 1 Kyd on Corp. 74–78; Grant on Corp. 98.)

Our Revised Statutes provided that every corporation, as such has power, among other things (§ 1, subd. 4), to hold, purchase and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited in its charter. By section 2 of the same title of the statutes the powers enumerated in section 1 " shall vest " in every corporation that shall hereafter be created, although " they may not be specified in its charter or in the act · under " which it shall be incorporated."

Section 3 provides that, in addition to the powers enumerated in the first section, and to those expressly given in its charter or in the act under which it is or shall be incorporated, no corporation shall possess or exercise any corporate powers, except such as shall be necessary to the exercise of the powers so enumerated and given. (1 R. S. 599–600, §§ 1, 2. 3.)

Under this power to hold, purchase and convey such real and personal estate as the purposes of the corporation may require, not exceeding the amount limited in its charter, the corporation could take property by devise, for the word purchase includes all means of acquiring property not coming to one by descent or the mere act or operation of the law. The same Revised Statutes, however, in providing for the transmission of real property by will, stated that " every estate " and interest in real property descendible to heirs," might be devised. " Such devise may be made to every person capable

" by law of holding real estate; but no devise to a corpora-
" tion shall be valid unless such corporation be expressly
" authorized by its charter or by statute to take by devise."
(2 R. S. 57, §§ 1, 2, 3.)

There are other provisions in the Revised Statutes relating
to corporations incorporated for purposes of education. It is
enacted therein that, " the trustees of every college to which a
" charter shall be granted by the state shall be a corporation."
(Sec. 31.)

" SEC. 36. The trustees of every such college, besides
" the general powers and privileges of a corporation, shall
have power

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

" 4. To take and hold, by gift, grant or devise, any real or
" personal property, the yearly income or revenue of which
" shall not exceed the value of twenty-five thousand dollars."
(1 R. S. 460, §§ 31–37.)

At the adoption of the Revised Statutes, therefore, the law
in this state was that a corporation could hold, purchase and
convey such real and personal estate as the purposes of the
corporation should require, not exceeding the amount limited
in its charter, but it could not take any real property by
devise unless it was expressly authorized by its charter or by
statute to take by devise. And there was power in the trus-
tees of a college to which a charter was granted by the
state, to take and hold real or personal property by gift or
devise, provided the income did not exceed $25,000 annu-
ally. Some time subsequent to the adoption of these
statutes, and in the years 1840 and 1841 (chap. 318 of
1840 and chap. 261 of 1841), the legislature passed
acts (the latter being an amendment of the earlier one)
by which trusts were authorized to be created by grants,
devises, and bequests of property to incorporated colleges or
other literary incorporated institutions in the state, to be held
in trust for specific purposes comprehended in the general
objects authorized by their charters. The acts contained no

limitation as to the amount or value of property which could be thus taken in trust by the corporation.

It was held, however, by this court in *Chamberlain* v. *Chamberlain* (43 N. Y. 424) that these acts did not repeal or affect the general law of the state limiting and restricting the amount and value of property which could be taken and held by literary and educational corporations, and it was therein said that the general laws of the state are in harmony with its policy, which has been uniform and consistent, so far as such policy is indicated by legislation in relation to gifts in mortmain, and the powers of corporations to take and hold property. It was further said that these statutes (those of 1840 – 1841) authorized the creation of special trusts, in furtherance of the objects of the corporations named, but that such trusts could be created and full effect given to the acts within the limits imposed by the general laws upon the power of the corporations to acquire and hold property. There being no express repeal of the general provisions of law or repudiation of the uniform policy of the state, the intent of the legislature to do either, it was said, could not be implied.

Thus the several provisions of law relating to the property of corporations stood at the time of the granting of its charter to Cornell University by the state in 1865. By chapter 585 of the Laws of that year, the legislature incorporated and established the Cornell University. In the first section of the act the following language is to be found : The corporation hereby created shall have the rights and privileges necessary to the object of its creation as declared in this act, and in the performance of its duties shall be subject to the provisions and may excercise the powers enumerated and set forth in the second article of the fifteenth chapter, title 1 of the Revised Statutes of the State of New York.

The second article above alluded to is entitled " of the " powers and duties of the trustees of colleges," and is to be found already referred to (*supra*) as 1 Revised Statutes, 460, sections 31 to 37. It is subdivision 4 of section 36 which authorizes the trustees to take and hold real or personal

property by gift or devise not exceeding the value therein
stated.

Section five of the charter reads as follows :

" SEC. 5. The corporation hereby created may hold real and
" personal property not exceeding three millions of dollars in
" the aggregate."

These provisions in the charter, together with the statutes
above alluded to, must be examined for the purpose of discov-
ering, if possible, what was the legislative intent towards this
corporation regarding property.

The learned counsel for the appellant claims at the threshold,
that the provisions of the Revised Statutes as to the incorpo-
ration of colleges (*supra*), with a single exception, were merely
intended to apply to institutions of learning incorporated by
the regents of the university of the state under the general
laws of the state.   He argues that the regents had power to
incorporate a college by virtue of the provisions of the act
(Chap. 82) of 1787, the provisions of which were re-enacted
in 1813 and incorporated subsequently into the Revised
Statutes, and at that time, and for many years thereafter, there
was no other way of incorporating a college unless by a
special act of the legislature.   Hence, he says these provisions
of law, general in their nature applied to corporations which
were incorporated by the regents, and were never supposed to
apply to corporations incorporated by special act, unless
expressly made applicable in the special act.

The counsel is right in his statement as to the fact when the
act was passed.   At that time there was no general law for
the incorporation of colleges or other institutions of learning,
other than by the regents, and when they granted a charter there
can be no doubt that its provisions were affected by the act as
contained in the Revised Statutes.   But the language therein
used (sec. 31), that the trustees of every college to which a
charter shall be granted by the state shall be a corporation, is
general in its nature, and it would seem to include all cases
embraced within its language.   That it is superfluous to apply
it to the case of a corporation which becomes such by virtue

of the very act which incorporates it, is not a conclusive answer. It is an argument from the point of view that it was unnecessary, but because it was unnecessary is not always, perhaps even generally, an argument against the applicability of a statute to a certain condition of things. It is alike unnecessary with regard to colleges or academies which were incorporated by the regents under the power granted them in the acts of 1787 and 1813, both of which acts expressly granted them power to incorporate colleges and academies by giving them a charter. When they did so the college or academy became a corporation by virtue of those acts which empowered the regents to incorporate it. The section (31) was, therefore, unnecessary in both cases, and yet it was adopted, and in its language it embraces all colleges to which a charter is granted by the state.

The thirty-sixth section provides that the trustees of every such college shall have power, among other things (subd. 4), "To take and hold * * * any real and personal * * * property, the yearly income," etc.

I think it plain, therefore, that the provisions contained in that title would be applicable to the Cornell University, although specially chartered by the state, unless inconsistent provisions were to be found therein. The charter, however, in so many words, makes this title applicable to the university. (See section 1 of the charter, part of the language of which is quoted *supra.*)

It is true that it states the corporation, *in the performance of its duties*, shall be subject to the provisions and may exercise the powers enumerated in the title mentioned, among which is the right to take and hold real and personal property. But the title itself is headed, "Of the powers and duties of the trustees of colleges," and among those powers and duties is the right above mentioned. I do not think that the use of the words "in the performance of its duties," would in any wise exclude the application of this fourth subdivision of section 36, and we must look elsewhere for such exclusion if it is to be excluded. That it is to be excluded all admit, but the

exclusion is founded upon a special provision in the charter itself which is wholly inconsistent with its continued applicability. The subdivision confines the taking and holding, by gift, etc., of real or personal property to a yearly income not exceeding in value $25,000, while the charter permits it to hold real and personal property to an amount not exceeding $3,000,000 in the aggregate.

Both sides admit that this subdivision in question is not applicable — the respondents, because an inconsistent provision in the charter expunges it, while the appellant claims that even if there were no inconsistent provision in the charter, it would still be inapplicable because the statute only applies to corporations incorporated by the regents. The provisions of the charter are inconsistent, and still we must look at all the other statutes above cited for the purpose of discovering what the legislative intent is. Looking at the general statutes we find corporations have power to purchase and hold property necessary for the purposes of their incorporation, not exceeding the amount limited in their charter, but they cannot take by devise unless expressly authorized by their charter or by statute so to take. Then the Revised Statutes prohibit corporations from possessing or exercising any corporate powers, except such as are enumerated or are expressly given to them by their charters, or such as shall be necessary to the exercise of the powers so enumerated and given. The statutes also allow the trustees of a college to take property by gift or devise not exceeding a certain annual income, and then come the acts of 1840–1841, and then the charter of this university. The argument of the learned counsel for the appellant is, as I have said, based upon the theory of the utter inapplicability of the act of the Revised Statutes as to colleges; and then he claims that the acts of 1840 and 1841 bestow a capacity to *take* property by will not exceeding the amount limited in the charter of the corporation; and he claims also that in this case there is no limitation of the power in the charter of the university *to take* real or personal property to any amount,

SICKELS — VOL. LXVI.   12

and the only limitation there is consists of a limitation upon the power of *holding* more than $3,000,000, in the aggregate. He thus obtains the power to *take* an unlimited amount of property by virtue of one act, and a limitation is only placed upon its power to *hold* by another act, and that is the organic act of incorporation itself.

I do not think such an interpretation of the statutes can be sustained. I think the fifth section of the charter gives the measure of the power of the university to take as well as to hold property. The language is an authority as well as a limitation. It is an authority to hold more than the Revised Statutes permitted, but it shall not be permitted to hold more than a certain specified amount. And if there were nothing said on the subject of property in the charter, I think the Revised Statutes as to the limitation for colleges would apply. Reading the language in the charter, it is difficult to imagine a holding without a previous taking of property, and the counsel for the appellant admits that if there were no other statute providing for a taking of property, the language of the fifth section of the charter would necessarily imply a right to take in order to hold. I do not think that his claim to derive an unlimited capacity to take by virtue of the Laws of 1840 and 1841, when construed with the other statutes and with the provisions in the charter, can be upheld as a fair exposition of the legislative intent upon the subject. The statutes of 1840 and 1841 were passed for the purpose of authorizing the creation of certain special trusts in connection with these educational institutions, which could not have been legally created prior to their passage, and their object did not in the least infringe upon the general laws of the state or its policy. As has been said, their passage did not repeal those general laws limiting the amount or value of property which corporations might take and hold. Because a special statute contained provisions upon the subject of the property of the corporation thereby incorporated, which were inconsistent with the general provisions contained in the Revised Statutes relating to the same subject, I do not think the effect was not

only to render the general law inapplicable, but also to twist the provisions of the law of 1841 in relation to the special trusts spoken of into a permission outside of and beyond the language of the charter to take property without any limitation as to amount or value. That might have been the effect if the charter had repealed those general provisions as to this corporation, and had made no other provision regarding it. Under such circumstances, the act of 1841 could have been referred to as permitting the corporation to take property by devise and in trust to an extent unlimited, but when the same language which renders the general law inapplicable also gives a power to hold property to a certain limited extent, it seems to me that such a power includes the power to take up to that sum, and limits it accordingly.

It is said that if the power to take an unlimited amount of property and to hold but a certain sum were contained in the same law, there could be no doubt upon the question of the power to take. That may be so, for in that case the legislative will would have been announced in terms which could not be misunderstood. But there is a great difference between the two cases. The question is always one of legislative intent, and the inquiry is whether the statute of 1841, providing for the creation of trusts, really applies in this instance to this university so far as an unlimited capacity to take property is concerned. For the reasons already stated, I think it does not.

Looking for a moment outside of and beyond the statute laws of the state, and in order to strengthen his position regarding the true construction to be given that law as to the material distinction in the case at least of a corporation, between the power to take and the power to hold property, the counsel for the appellant has made a most able and learned argument. Its outlines are, in substance, as follows : A corporation at common law could take and hold property by devise. At an early stage in the history of the law of England, relating to the power of corporations to hold real property, and while the feudal system still prevailed, it was

enacted that no man should alien his feud to a corporation under penalty of a forfeiture thereof to his next superior, of whom he held the land, and in default of such superior insisting upon the forfeiture, then his superior might do so, and thus on until the king, as the general superior and lord of all, was reached. But in case the forfeiture was not insisted upon, the corporation, which had taken a defeasible title to the land, could hold it as against all the world.

He therefore insists that this distinction between taking and holding strengthens his claim that the use of the word *hold* in the charter was intentional and for the specific purpose of permitting the corporation to *take* an unlimited amount of property and to *hold* only the amount specified. No sound reason for giving such unlimited power to *take*, while limiting the power to *hold*, can, as it seems to me, be stated. And if such were the intent, I think it would have been plainly stated in the charter instead of trusting to such a conjectural application to be given to another statute.

The counsel cites about all the writers upon the subject of corporations, and they have all adverted to this distinction, as existing in relation to the English corporations subject to the mortmain statutes, and they state that licenses to hold in mortmain were granted to such bodies, but without such licenses they took the title to the real property aliened, subject only to the right of the superior lord to enter and take the land under the power of forfeiture. The only penalty, therefore, which a corporation risked when it took lands without a license in mortmain was that of a forfeiture of the land to the next superior of the grantor, and so on up to the king; and the counsel claims that in this state, in the case of a corporation with unlimited power to take, but not to hold more than a certain amount, the penalty for holding more is that the state, representing the whole people and standing in this respect in lieu of the king (there being no mesne lords), can forfeit the charter of the corporation and thus prevent the further holding. And assuming this to be the fact, he uses it as strengthening his

argument as to the existence of this clear and material distinction between taking and holding property.

The further claim is then made that, as title to the property has vested in the corporation, which, in holding it, has become subject to the forfeiture of its charter, the heirs or next of kin of the testator have no more right to raise the question than any other third parties who have no interest therein. It is said that it is a matter for the state alone to take cognizance of, and until it does the corporation holds the property, however much it may transcend the limitation prescribed in its charter.

The counsel states accurately the law of mortmain in England and its consequences of possible forfeiture of the estate granted, and, until forfeiture, the vesting of the title in the corporation indefeasible, except by the re-entry of the person entitled to take it by reason of the forfeiture. But the circumstances under which lands are held by citizens of New York, where their tenure is so wholly different from that which prevailed in England when the early mortmain acts were enacted, render any argument in regard to those acts and their effect totally inapplicable to the case of a corporation of this state. Taking the law as it exists in our statutes, including the special provision upon the subject in the charter of the university, it seems to me that the provision therein, limiting the holding of property, is, as I have said, a restriction also upon the power to take in excess of the specified amount. As, at common law, a corporation could take real property in the same way as an individual, the consequence was that, in England, large landed possessions were held by religious corporations, and, by reason of alienations of real estate to them, the services due by the vassal to the lord were partially, if not totally, paralyzed, and the chief lords lost their escheats. This was a constantly growing and alarming evil. To remedy the difficulty, the first mortmain act was placed in Magna Charta, which declared all such alienations to corporations entirely void, and that the lands should revert to the lord of the fee. It was held, however, that the reversion must.

be accomplished by *an entry*, and then and from that time there, was a forfeiture, the corporation having taken the title and held the property until such forfeiture by re-entry. (Shelford on Mortmain, 8, 34; 1 Kyd on Corp. 81; Grant on Corp. 106.)

Other statutes upon the subject were subsequently enacted, all for the purpose of preventing the great accumulation of real property in the hands of corporations, and they all provided substantially for a re-entry on the part of the next superior lord whenever lands had been aliened in mortmain, and, until such entry enforcing the forfeiture, the corporation held the lands. There was one law, directed against superstitious uses (23 Henry VIII, Chap. 10), which provided that the grant to such uses for more than twenty years was absolutely void, and the estates thus aliened would have gone to the grantor or his heirs, excepting for a provision, subsequently made, giving such estates to the king. (Wilmot's Opinions, 9, 10, in *Attorney-General* v. *Downing*, variously reported: Ambler, 550–571; 1 Dick. 414; 3 Ves. Jr. 714; 5 id. 300; 8 id. 256.) The mortmain statute (9 George II, Chap. 36) renders all *devises* to charitable uses void. (Shelford on Mortmain, 118–120.)

The nature of the tenure of real property at the time of the passage of the early mortmain acts in England bears no resemblance to the tenure by which a citizen of this State holds lands. Here there is no vassal and superior, but the title is absolute in the owner, and subject only to the liability to escheat. (Const. of N. Y., art. 1, § 13.) The escheat takes place when the title to lands fails through defect of heirs. (Const. of N. Y., art. 1, § 11.)

A devise to a corporation which is forbidden to take (or forbidden to *hold*, *if the word*, under the circumstances of the case, is construed to include a taking also) does not, therefore, give a title subject to the right of some superior to claim a forfeiture of the land; but if it be in violation of a statute, I think the devise is void and the land descends to the heir or residuary devisee.

We have not in this state re-enacted the statutes of mortmain or generally assumed them to be in force, and the only legal check to the acquisition of lands by corporations consists in those special restrictions contained in the acts by which they are incorporated, and which usually confine the capacity to purchase real estate to specified and necessary objects. (2 Kent's Com. 282.) Of course, the restrictions contained in any general law, if applicable, must also be referred to.

There is, by reference to our laws, no such necessary and universal distinction between taking and holding property by corporations, as is seen in the laws of England relating to alienations in mortmain. Whether the legislature, when using language providing for a limitation upon holding property, meant to permit an unlimited taking, is a question of legislative intent; and I think the general inference would be, in the absence of some plain and controlling circumstance to the contrary, that the legislative body meant to limit a taking as well as a holding beyond the specified amount. As is said in the *Chamberlain Case,* this is in accordance with the policy of the state, a policy which has been recognized as existing for many years, and which the courts have concurred in approving and carrying out. I do not think the statute (Laws of 1779, chap. 25, § 13) touches this case. It provided that the absolute property of all lands, etc., and all rents, franchises, debts, dues, duties and services, escheats and forfeitures, which before the 9th of July, 1776, vested in or belonged or were due to the crown of Great Britain, were and forever after the 9th day of July, 1776, shall be vested in the People of the state, in whom the sovereignty and seigniory thereof are and were united and vested.

The counsel for the appellant does not claim that this property was itself forfeited to the state, if the state should choose to enforce the forfeiture. His claim is, as I understand it, that if the university exceeded its limitation by holding more property than it was allowed by law to hold, a cause of forfeiture of the charter was thereby created, and that in enforcing such forfeiture, after the payment of the debts of

the corporation the rest of the property would (as he insists) probably go to the state because there would be no living claimant to it who would have any right to acquire it. A forfeiture the state may claim and may enforce at pleasure when the occasion arises, but it is a forfeiture of the charter and not a forfeiture of the property held by the corporation. It is further claimed that this distinction between the right to take and the power to hold property is one which has been admitted and enforced in the courts of England, of this state and of the other states of the union for a long number of years; and that there is no reason why effect to such a distinction should not be given in this case, the result being, as is stated, that the corporation has an unlimited right to take property and also an unlimited right to hold it as against any one but the state in its capacity of sovereign. There is undoubtedly a distinction between the right to take and the power to hold property under some circumstances, the only question being whether the legislature had such distinction in mind and meant to provide for it · in the case in hand. It is said that an alien has the right to take property by purchase, but he cannot hold it as against the state. That is so. He takes, however, a defeasible title, good as to all but the sovereign power, which must take it upon office found or by escheat. ( *Wright* v. *Saddler*, 20 N. Y. 320.)

In such case it is not exactly an accurate description of the alien's title to simply say that he can take but cannot hold. That is a contradiction in terms. If he take, he must hold, if for but a fractional part of a second of time. The expression is but a short one for the statement that he cannot hold, as against the claim of the state, where properly made and enforced. The same expression is used in the case of a corporation under the mortmain laws, that it can take but not hold, the meaning being that it cannot hold as against the claim for forfeiture when made by the next superior lord of the grantor of the lands. That the words lose all their meaning when wrenched from the circumstances under which

they were used, and applied to corporations existing by virtue of the laws of this state, seems to me a plain proposition.

The counsel has, however, with great industry and research, cited a number of cases from our own courts and those in other states, where this distinction, he claims, has been admitted, and in cases, too, where the principles involved were similar to the case at bar (one or two being, he says, precisely like it), and where it has been held that in such cases, although the corporation has violated the law of its being, yet no one but the state could take advantage thereof.

I think that, with the exception of one case, they were all entirely different from this one, and the decisions were based upon a totally different and probably a perfectly unassailable ground.

The principal case, or at least one of the early ones, is that of *Leazure* v. *Hillegas* (7 S. & R. 313), which arose in Pennsylvania and was decided in 1821. The restriction in the charter of the Bank of North America was that the bank should not purchase and hold property excepting under circumstances therein stated. The directors of the bank accepted from their grantor, William Henry, a conveyance of his land (not within their specified powers) at a fair price, in payment of a debt, *bona fide*, due. The question was whether the corporation could hold and convey a title? TILGHMAN, Ch. J., said : " The restriction is that the bank shall not purchase and " hold. Purchasing and holding are very different things, " and the consequences of each are very different. To pur- " chase *and* hold might have been thought dangerous, but to " purchase, subject to the statutes of mortmain, which author- " ized the state to appropriate the land to its own use, could " be attended with no danger."

The court there held that some portions of the mortmain laws of England were in force in Pennsylvania, to the extent of permitting the state, as the sovereign lord, there being no mesne lords, to enter and claim the forfeiture, and that until the state did so, the title of the corporation was good, and it

could convey such a title to its grantee. No such laws have been in force in this state.

Under the modern acceptation of the law regarding corporations, this case could probably be supported on an entirely different ground, viz., that it was an executed contract or conveyance, upon a good consideration, and that the grantor could not be heard to dispute his own grant under the circumstances; and that no one could take advantage of this violation of its charter by the corporation excepting the state, which could proceed to forfeit the charter because thereof. The case is no authority in this state for the proposition that none but the state can interfere, nor is it of any importance upon the question as to how material it is to note the absence of an express limitation in words upon the power to take property under the charter of the university. *Baird* v. *Bank of Washington* (11 S. & R. 411) is a somewhat similar case, and decided also upon the authority of *Leazure* v. *Hillegas* (*supra*). *Goundie* v. *Northampton Water Company* (7 Penn. St. 233), decided in 1847, refers to the *Leazure Case.* It was also a case where the contract was on a good consideration, and the company had the right to contract for the land and pay for it, and a deed for value would vest in it a good title, subject to the right of the state to interfere, etc. The case of *Runyan* v. *Coster* (14 Pet. [U. S.] 122), decided in 1840, upon appeal from the Circuit Court in Pennsylvania, was decided with express reference to the statute of that state, passed April 6, 1833, relative to escheats, which permitted the corporation to retain the title, subject to be divested at any time by the commonwealth. The decision was put upon the ground of the act of 1833 and the doctrine of the Supreme Court of Pennsylvania in the *Leazure Case.* These are the cases cited from the Pensylvania courts, and it is plain they furnish no support for the contention in this case, in the absence of those laws of mortmain upon which they were founded.

There is one case, however, which has been decided by the Supreme Court of the United States upon the question of

who may take advantage of a violation of the charter in rela-
tion to the power to hold property, which comes very near
the case at bar.  The decision of that court goes quite a
distance towards sustaining the contention of the appellant's
counsel, although there was another ground upon which the
decision could rest.  The very great respect which we all feel
for any decision of the Federal Court of last resort, and for
any opinion given by its learned and able judges, even in
cases where it is not binding upon us, renders it necessary to
examine the case with some care.  The case is *Jones* v.
*Habersham* (107 U. S. 174).  The head-note is: "Restrictions
"imposed by the charter of a corporation upon the amount of
"property it may hold cannot be taken advantage of collater-
"ally by private persons, but only in a direct proceeding by
"the state."

The testatrix, a resident of the state of Georgia at the time
of her death, devised and bequeathed to the Georgia His-
torical Society certain land for the purposes of maintaining a
historical society, etc.  The corporation was incorporated in
1839, and had power to purchase, take, hold, etc., lands and
tenements, provided the clear annual income of such real and
personal estate should not exceed the sum of $5,000.  It was
admitted that the net income of the corporation from
property held by it at the time of the death of the testatrix
was between $3,000 and $4,000, and that the income of the
property bequeathed to it by her will would add $7,000 to
that income.  The appellants, who were the heirs-at-law and
next of kin of the testatrix, claimed that the gift was void
*in toto*, as it gave more than the corporation was allowed to take
or hold.  The court, per GRAY, J., stated the answer to such
proposition in the language of the head-note above quoted,
and, without argument, referred in support of such doctrine
to five cases, viz.: *Runyan* v. *Coster* (14 Pet. 122, 131);
*Smith* v. *Shelley* (12 Wall. 358, 361); *Bogardus* v. *Trinity
Church* (4 Sand. Ch. 633, 758); *De Camp* v. *Dobbins* (29
N. J. Eq. 36); *Davis* v. *Old Colony Railroad Company* (131
Mass. 258, 273).

Upon looking at those cases I have been unable to find that they *decide* the principle they are cited to sustain. It seems to me that the question was not really and fully presented, discussed or decided in any of them. The first case, *Runyan* v. *Coster* (14 Peters, *supra*), has already been cited and sufficiently discussed. It was decided upon the express statute of Pennsylvania, and can be no authority for the general doctrine stated by Mr. Justice GRAY in his opinion. The next case is *Smith* v. *Shelley* (12 Wall. 358–361). The bank in that case had been incorporated by an act of a territorial legislature, where a law of Congress was in force providing ·that no act of such a legislature incorporating a bank should have any force until approved by congress. The bank had power under the territorial act " to buy and possess property of every kind." Land was sold to it for a money consideration paid by it.

Mr. Justice DAVIS, in his opinion, said: " It is insisted, " however, as an additional ground of objection to this deed, " that the bank was not a competent grantee to receive title. " * * * It could not legally exercise its powers until the " approval of congress was obtained, but this defect in its " constitution cannot be taken advantage of collaterally. " * * * Conceding the bank to be guilty of usurpation, " it was still a body corporate *de facto* exercising at least one " of the functions which the legislature attempted to confer " upon it, *and in such a case the party who makes a sale of* " *real estate to it is not in a position to question its capacity* " *to take the title after it has paid the consideration for the* " *purchase* " This, as it seems to me, is also very far ·from authority for the proposition for which it is cited. The grantor dealt with it as a corporation, received its money, and should not be heard to deny or question its existence.

The next case cited by the learned judge is *Bogardus* v. *Trinity Church* (4 Sand. Ch. 633 ; Vice-Chancellor's opinion, 720–758, as to point in question.) It was provided that the church could not hold more than an income of £500. The fact was that when the grant in question was made it did not hold, with the grant, nearly as much as it was allowed. Then the

vice-chancellor said, if it did, it was a question between the corporation and the sovereign power, in which individuals have no concern, and of which they cannot avail themselves in any mode against the corporation. This was mere *obiter*. The question was not involved nor decided. It was not a case of a devise to a corporation holding at the time of the devise more property than the law permitted, and where the question was whether such devise was good, and, if bad, whether the property (not devised by a valid devise) passed to the heirs.

The defense of the defendant was, among others, adverse possession, and that defense prevailed. The case referred to by the vice-chancellor (*Humbert* v. *Trinity Church*, 24 Wend. 587, 604, 629) did not decide the question either. The ground of the decision was that the plaintiff's claim was barred by the statute of limitations. COWEN, J., says (p. 605): "Admit " that the law will cast no title on the corporation, the answer, " in the words of the statute, is equally fatal. You have been " out of possession for more than twenty years, and are thus " disqualified to maintain an action to recover your land against " us or any other." It was a decision upon a question of adverse possession.

Senator FURMAN (page 629), in his opinion, assumes from the evidence that the real estate, when received, counting all defendant ever had, did not amount to the limitation of £500. He adds, in giving another view of the case, that the "restriction is a mere question of governmental policy, and " individuals, as such, have nothing to do with it, and no con- " trol over it. That it is only voidable at the instance of the " supreme power." He cited no authorities and the question was not before him.

The case is only authority for the proposition that a corporation can insist upon a title to property by adverse possession, which when proved is as potent to close the mouth of a claimant to the property in the case of a corporation as in that of an individual. To same effect, *Harpending* v. *Dutch Church* (16 Pet. 455); *Bogardus* v. *Trinity Church* (4 Paige, 178).

Then comes the case of *De Camp* v. *Dobbins* (29 N. J.

Eq. 36), which was a devise to a charitable corporation claimed to have been restricted to a holding of property to the amount of $2,000 annual value. The chancellor found that by a later statute the restriction did not exist. He then gave a *dictum* that if a corporation takes land by grant or devise, in trust or otherwise, which by its charter it cannot hold, its title is good as against third persons and strangers ; the state alone can interfere.

This *dictum* is opposed by another distinguished judge of New Jersey (Chief Justice BEASLEY), who, on appeal to the Court of Errors and Appeals in the same case, took occasion, in delivering the unanimous opinion of the court, while affirming the judgment below, to dissent from any such view of the law. I shall have occasion to refer to the case again. (*De Camp* v. *Dobbins*, on appeal, 31 N. J. Eq. 671, 690.) The New Jersey case cannot, therefore, be regarded as the least authority for the main proposition under discussion.

The last case cited by the learned justice is that of *Davis* v. *Old Colony Railroad Company* (131 Mass. 258–273). The case decides that a railroad company had no power to guarantee the payment of the expenses of a musical festival, although it was expected that profits would result to the railroad company therefrom.

Incidentally, and as part of the general argument, the court, in the opinion at page 273, mentions the doctrine contained in the *Leazure Case* (*supra*), and in *Old Colony Railroad Corp.* v. *Evans* (6 Gray, 25). Neither case decides the question, and it was not involved in either. This completes the examination of the cases cited in the opinion in *Jones* v. *Habersham*, and I think that it cannot be said that they really furnish any very secure foundation for the doctrine contained in that case, and I think the doctrine is opposed to the principle of the *Chamberlain Case* (*supra*), decided by this court. The other cases cited in the printed argument of the counsel for the appellant, are mostly cases where a corporation has contracted with parties on a valid consideration, and where a conveyance has been made and then it is sought to raise the

question as to the power of the corporation to take or convey a title, and it has been held that in such cases of an executed contract, if the corporation has violated the statute, the parties seeking to set up such violation would not be heard, and in such case none but the state would be. That one who contracts with a corporation shall not, under such circumstances, be heard to raise the question, is, in substance, the principle decided.

Such are the cases, in substance and principle, of *Cowell* v. *Springs Co.* (100 U. S. 55); *Hough* v. *Cook Co. Land Co.* (73 Ill. 23); *Alexander* v. *Tolleston Club of Chicago* (110 id. 65); *Barnes* v. *Suddard* (117 id. 237); *Cal. Tel. Co. v. Alta Tel. Co.* (22 Cal. 398); *Natoma Water Co.* v. *Clarkin* (14 id. 544); *Haywood* v. *Davidson* (41 Ind. 212); *Baker* v. *Neff* (73 id. 68); *C. B. & Q. Co.* v. *Lewis* (53 Iowa, 101); *Land* v. *Coffman* (50 Mo. 243); *Chambers* v. *City of St. Louis* (29 id. 576); *Barrow* v. *Nashville, etc., Tel. Co.* (9 Humph. 304); *Baker* v. *Northwestern Guaranty Co.* (36 Minn. 185); *Missouri, etc., Co.* v. *Buchwell* (2 Neb. 192). I have examined all of these cases, and while the facts are, of course, not precisely similar, yet in not one of them does the fact exist of a devise of property to a corporation which it cannot hold, because the limitation has been reached provided for by statute, and, of course, no doctrine that in such a case the heirs cannot claim the property, is advanced.

In most of them the court looks upon the question as one of a forfeiture of the charter on account of a violation of some limitation therein contained, and in such case, it is said, none but the sovereign can raise such question.

The case of *Hayward* v. *Davidson* (41 Ind. 212), was that of a devise of real estate to county commissioners for the use of the county. The court held that the county was authorized to acquire and hold title to real property for some purposes, and it could not be made a question by any one, except the state, whether or not real estate acquired by such county has been thus acquired for authorized purposes or not. That the *title passed* under the power of the county to take

real estate for some purposes, but the court also said if the charter or the law has forbidden a corporation to take, then a deed or devise passes no title.

In the case at bar, where the statute authorizes the corporation to hold not exceeding a limited amount, is it not the same thing, in substance, as a prohibition against holding and, therefore, a prohibition against taking any more? And when the limit is reached, is it not the same as an original prohibition against taking any? In *Chambers* v. *City of St. Louis* (*supra*), the court held, also, that there was a right in the city to take and hold lands, and if there were a capacity in the vendor to convey, so soon as there was a conveyance there was a complete sale, and if the corporation, in purchasing, violates or abuses the power to do so, *that is no concern of the vendor or his heirs*. It is a matter between the state and the city. This case rests upon the same principle above alluded to.

In the case of *Vidal* v. *Girard's Executors* (2 How. [U. S.] 127), the trusts created by the will of Stephen Girard were held valid, and the court said that in such a case, if the corporation were incompetent to execute them, the heirs could not take advantage of such fact, as that could only be done by the state by *quo warranto* or other judicial proceeding. This is upon the ground that the *trust was a valid trust*, and if so, and the corporation, as such, had no power to execute it, the trust did not, for that reason, fail, but upon the failure of the corporation for lack of power, to execute it, a court of equity would appoint a new trustee. Of course, the heirs had no interest in the question when once the trust was declared valid, whether the corporation was exceeding its power in taking upon itself the execution of the trust or not. They had no title to or any further interest in the property. They stood, therefore, in respect to the corporation, as any other strangers. The case does not aid the appellant upon the matter under review.

I have not yet referred to all the cases cited by the indefatigable counsel for the appellant, but I have read them all,

and in not one is the question fairly up and decided in the way he asks the court to decide this case.

The cases decided by the Supreme Court of the United States, known as the National Bank Mortgaging Cases, are cited to sustain the view of counsel. (*National Bank* v *Whitney*, 103 U. S. 99; *Fortier* v. *New Orleans Nat. Bank*, 112 id. 439.)

They were cases where the bank took a mortgage from a party to secure future advances (against the act of congress), which advances it subsequently made, and for the non-payment of which it attempted to foreclose the mortgage, when the mortgagor set up the violation of the act. The court held that the act did not make the security void, and that the government meant that the only penalty should be the right of the government to proceed against the bank for a judgment of ouster and dissolution. Certainly the party who had contracted with the bank, and had obtained its money on the faith of the security, had no equity in his claim. It is not, however, in the least analogous to the subject under discussion. Yet, even in that case, this court held that the mortgage was void because taken in violation of the national banking act (*Crocker* v. *Whitney*, 71 N. Y. 161), and it was stated, as the undoubted law of this state, that a contract made in violation of a statute is void, and it is immaterial that it is not so declared in the statute itself, and that a security taken in violation of a statute is void.

As the case involved the construction of an act of congress an appeal was taken to the Federal Supreme Court, where the judgment was reversed and the penalty for a violation of the act was held to consist in the right of the government to proceed against the bank for a forfeiture of its charter, and the security was held valid.

The counsel refers to the general doctrine of *ultra vires* in respect to corporations, and shows that, as matter of fact, corporations have power to violate the law of their existence, or, in other words, to do wrong; and he cites *Bissell* v. *Railroad*,

*Company* (22 N. Y. 259); *Whitney Arms Company* v. *Barlow* (63 id. 63); *Atlantic State Bank* v. *Savery* (82 id. 292); *Rider, etc.,* v. *Roach*(97 id. 378).

. The theory upon which the plea of *ultra vires* is examined is that it will not, as a general rule, prevail whether interposed for or against a corporation, when it will not advance justice but will accomplish a legal wrong. (See above cases.)

I do not perceive that any assistance accrues to the appellant from a presentation of this doctrine. There is no question between these parties of a contract nature, nor any fact which ought to preclude the respondents from setting up any legal bar to the right of the corporation to take title to property which they claim either as heirs-at-law or as legatees or devisees.

The cases of the *Elevated Railroad* (70 N. Y., 327, 338) and *Moore* v. *Brooklyn, etc., Railroad* (108 id. 98, 104) are cited to show that none but the sovereign can take advantage of a forfeiture of the charter, and that must be in a direct proceeding against the corporation. The principle is undenied. But in a case like this it is no forfeiture that is being insisted upon. It is simply a question of title to the property, and, provided it has not been legally devised or bequeathed, it necessarily vests in the heir or next of kin.

But it is said that where property is given to a corporation which has power to take or hold under some circumstances, the title vests in the corporation, for otherwise the state would never obtain the right to forfeit even the charter for a violation thereof. The argument is, the corporation would answer a claim to forfeit the charter by the fact that the charter precluded it from taking such property, and, therefore, as it could not, it had not done so. I do not see the force of the argument. The charter may preclude the rightful taking of the property by the corporation, and may prevent the legal title from vesting in it, but that has nothing to do with the fact that, nevertheless, the corporation has, as a physical act, taken the property and may be insisting upon its right to keep it as matter of law. In such case can there be any doubt that the corporation has taken and is holding the property as its

own and in defiance of the charter, and that it may be punished by having its charter forfeited, although the rightful owner of the property may thereafter obtain his own? The fact that he does obtain it is no answer to the other fact that the corporation had taken it, nor is it any legal answer to the claim of forfeiture of the charter, on the part of the state, that it was unsuccessful in continuing to hold the property against the charter provisions.

Although we never adopted or enacted the English statutes of mortmain, yet in this, as in other states, we have a decided mortmain policy. It is found in our statute in relation to wills, prohibiting a devise to a corporation unless specially permitted by its charter or by some statute to take property by devise.

"It is a statute of mortmain, resting on a mortmain policy "as distinctly as any act of the British parliament. * * * "The necessity is recognized of forbidding the acquisition by "will, unless the legislature, in granting the charter, and in "full view of the reasons for so doing, think proper to confer "the power in express terms. * * * Nor is this neces- "sity by any means a fanciful one. It is eminently praise- "worthy to give in the interest of charity and religion. But "in the last hours of life exaggerated impressions of chari- "table or religious duty often obscure the judgment of men "and subject them to undue influence and persuasion. Against "these the statute is intended to guard, because it is in behalf "of associations incorporated for pious and benevolent pur- "poses that the sentiments of men in such situations are "most generally appealed to. *The enactment is, therefore,* "*prohibitory and it ought to be expounded and applied in* "*that sense.*" (Per COMSTOCK, Ch. J., in *Downing* v. *Marshall*, 23 N. Y. 366, 387.)

"Judges have given the widest possible scope to statutes in "restraint of the disposal of property in mortmain, and have "been astute in their arguments for the application of such "statutes to cases as they arose. (Per GIBSON, Ch. J., *Hillyard* v. "*Miller*, 10 Penn. 326.) The courts ought not to impute an

"intent to the legislature not clearly expressed, in direct
"hostility to the traditions and policy of the past. * * *
"Claiming property and seeking the aid of the courts to
"reach it, the corporation can rely only on the warrant and
"authority conferred by law, and cannot claim in transgression
"or excess of that authority. * . * * Doubtless, the
"restriction upon corporations is a governmental regula-
"tion, and one of policy, and to be enforced by the govern-
"ment; but an individual whose interests will be affected by
"a transgression of the rule, may assert and insist upon
"the limitation as a restriction upon the power of the cor-
"poration to take." (Per ALLEN, J., in *Chamberlain* v.
*Chamberlain*, 43 N. Y. 424–439.)

Under our general statutes upon the subject of the right to
take or hold property by corporations, and reading them in
connection with the provisions of the charter of the university,
we should be astute in our arguments *against* the application
of the mortmain statutes instead of in favor of them, if we
should decide that the language of the charter did not apply
as well to a taking as of a holding of property beyond the
expressed limit.

There can be no doubt that it is the law, in this state at least,
that if there be a prohibition against the taking of property
beyond a certain amount or value, a devise or bequest to a cor-
poration of property which will exceed the amount or value
which the corporation is permitted to take, will be void for the
excess. This is expressly decided in the *Chamberlain Case*, and
we think it was rightly decided. Nor is there any doubt that in
such a case the heirs or next of kin can raise the question.
This was also decided in the same case. (See, also, *White* v.
*Howard* (46 N. Y. 144). When we come to the conclusion,
therefore, that this university is by law precluded (or was pre-
cluded at the time of the death of Mrs. Fiske) from taking
more than the 'amount of property limited in its charter, we
bring the case precisely within the rules laid down in the
cases just cited.

The language of Chief Justice BEASLEY, in the case of

*De Camp* v. *Dobbins* (31 N. J. Eq. 690), is very appropriate here. He says: " Nor can I assent to the other " proposition that if, as the contention assumes, this bequest " is violative of the law if carried into effect, that none but " the state can intervene. I find no warrant for such a doctrine, " either in the legal principles belonging to the subject or in " the adjudications. There can be no doubt that there are " cases in which, where a corporation has acquired rights of " property to an extent or in a manner unwarranted by its " charter, no one but the public can have the right to complain. " A grantor making title to a corporation might be estopped " from questioning the effect of his own conveyance. So a " mere stranger could not question such a corporate title. " But I have not observed any decision that asserts, where a " title is created by devise which vests in a corporation for its " own use a larger quantity of property than the laws authorize, " that the heir-at-law has no right to make objection. The " authorities referred to do not lend countenance to such a " doctrine." The learned judge refers to the cases of *Bogardus* v. *Trinity Church* and *Leazure* v. *Hillegas* (both cited *supra*), and continues: " These cases rest on the obvious " principle that the capacity of the corporate body to become " the grantee in the given case cannot be challenged by a party " who does not stand in a position to raise the question. In " such a position it would be true that the state alone could " object to such corporate act. But such instances are to be " discriminated from that other class, where the corporation " claims to take and hold by devise, in contravention of law, " and the heir of the devisor is the party complaining. In " this latter situation the doctrine enforced in the cases does " not apply. * * * I have no doubt that the heir-at-law " has a standing in court to raise such a contention, and that " in a court of equity he would be entitled to prevail if he " could succeed in establishing the proposition on which such " defense rests." The court affirmed the judgment below on the ground that the corporation was not prohibited from taking the property.

The counsel claims, however, that a devise to a corporation vests the title in it, so far as the question of capacity is concerned, whenever it would in the case of a sale for a valuable consideration. Hence he says that the cases of sales above cited are decisive of this, if they be admitted as well decided. In the case of an executed sale, however, the question of *ultra vires*, as set forth in the modern cases, comes in play, and the question of a want of title in the corporation in such case would not be permitted to be raised by the grantor or his heirs, because it would be against justice and would accomplish a legal wrong. (*Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62.)

The question of an executed gift without consideration by a donor, by an absolute delivery to a corporation without power to take, is also instanced, and the question is asked whether the title vests in such a case in the corporation so that the donor or his heirs could not recover it back, and if it do, the counsel asks where is the difference in the two cases. It is time enough to decide such a case when it arises. But it seems to me there is a decided difference. In the one case the gift is made *inter vivos* by the absolute owner, and it is made effectual as to him by a delivery. In such case it would seem that *he* stands in no position to ask the aid of the court to get him out of a situation into which he voluntarily entered with his eyes open, and the court might well say to him that he stood in no position to attack the right of his donee to property which he freely and absolutely gave it. As to his heirs it could be said that their ancestor had made a disposition of property which was absolutely his own in his lifetime, and in such a way that he could not question its validity, and that as *he* could not, they succeeding only to his rights, were alike disabled.

In the case of a devise, however, the case is essentially different. The will does not take effect until the testator's death, and then, if his property is not legally devised or bequeathed, no title vests for a single moment in the devisee. or legatee, but it vests instantly in the heir or next of kin;

and the corporation claiming under the will asks the aid of the law to give the property to it, and in so doing it must show the authority it has to take. And if there were only a prohibition in words against *holding* the property, would the law not be doing a vain thing in handing it over to a corporation which by the very fact of holding would render itself liable to have its charter forfeited on that account? Would not the prohibition against holding be properly and necessarily construed as a prohibition against taking also?

Is not this an argument against the right of the corporation *to take*, if by *holding* it is thus rendered liable to such a penalty? And is it not an argument in favor of the construction of the language in the charter that the limitation upon the power to hold property is, under all the circumstances, a limitation upon the power to take any more than it can legally and properly hold?

One more statement must be noticed. It is said that as the legislature, subsequently to the death of Mrs. Fiske, passed an act which took away any limitation on the power of the university to hold property, this action of the legislative department of the government throws a strong light upon what is the policy of the state regarding institutions of learning, and, in the view of appellant's counsel, waives the right which might have existed on the part of the state to claim a forfeiture of the charter of the corporation. But the policy of the state in relation to what may be called its mortmain laws is to be gathered from its statutes of general application on that subject, and cannot be said to be altered by the passage of special acts regarding particular corporations.

Nor do I think the counsel for appellant shows any change in the general policy of the state by referring to the acts of 1840 and 1841, already cited, as indicating a purpose to open the door to an unlimited accumulation of property by educational institutions in general. Those acts, as has been said, did not enlarge the capacity of corporations to take property more than they could take under the general laws. The act of 1864, as to union and high schools, by which the board of

education has power to take and hold property for educational purposes, and where permission was given to bequeath property to the state or to the superintendent of public instruction for the support or benefit of common schools, or to any county or district school commissioner, for such support, does not betray any change in the policy of the state upon this subject. The bequests spoken of are to the political subdivisions of the state or to the state itself as a corporation, but in its political capacity, and the property remains to be administered by the state officials or the officers of such political subdivisions, for the purposes of education in the common or high schools which the people are taxed to support. This is an entirely different thing from gifts to what may be termed a private educational establishment. Our courts have been quite unanimous in their opinions as to what the policy of the state was and is on this matter; and the extracts I have made regarding it, from the opinions of two very eminent former judges of this court, could be added to very largely by citing opinions of other judges in our own state, but it is not necessary.

However perfect may be the waiver in the act alluded to, of the right of the state to forfeit the charter of this university on account of any alleged violation thereof, such act can, of course, have no possible effect upon rights of property which vested at the death of Mrs. Fiske and before the passage of the act in question. (*White* v. *Howard*, 46 N. Y. 144.)

The counsel asks what is to be done in regard to the real property in other states, if we hold this corporation has no power to take any more property? It is said the surrogate has found, as a *fact*, that the university had legal capacity to take and did take by devise all the real property the title to which was in Mrs. Fiske at the time of her death, in those states. He says the title to real estate is governed by the laws of the states where the real property is situated. And that in the states in question it is held that a corporation can take under such circumstances as this case. This will devises no real estate to Cornell University.

It gives to the university $40,000 in trust for the erection

and furnishing and support and maintenance of a hospital; $50,000, in trust, for completing and perfecting the McGraw building; $200,000, in trust, for the McGraw library fund, and it gives and devises the residue of the property of the testatrix, if any, to be added to the last mentioned fund. It then directs that the estate of the testatrix shall be converted into money or available securities by her executor as soon as it can be done, having in view the best interests of the estate. This direction to convert operated as an equitable conversion of the estate of the testratrix into money or available securities, and hence no real estate in other states has been devised by her to the university. It is needless to inquire what would have been the rule in case real estate in other states had been specifically devised to the university, while this court should at the same time decide that it held property up to its charter limit, and that it had no capacity to take or hold any more real or personal property than the amount specified in its charter.

Upon a review of the whole question as to the proper construction of the legislation, general and special, affecting this university, I am of the opinion that it had no power to take or hold any more real and personal property than $3,000,000, in the aggregate.

*Second.* Coming to the conclusion I have, on the first branch of the case, it becomes necessary to examine the second and only remaining question, viz. : Does this property, if taken and held by the university, exceed the amount which by law it can hold?

The decision of such question depends partly upon the view which should be taken of the character of the holding under which the university now possesses certain property, which is described in the finding of the surrogate as property derived from the nation and state, and which he finds amounted to $2,088,012.78, and which was made up, as he also finds, of western land contracts, $439,834.22, and of western lands to the amount of $1,648,178.56; and he states, as part of his

finding, that this total of $2,088,012.78, was due or payable by the university to the state, or, in other words, that the university owed the state that sum, and consequently it should not be regarded as any part of its property. This finding has not been concurred in by the General Term, which has modified it by holding that the same is to be taken into account as part of the property of the university.

The state of facts under which the question arises is undisputed, and it becomes a question of law as to what is the proper legal inference to be drawn from the undisputed facts, and the decision of that question is reviewable in this court.

Stated as briefly as may be, the facts are these : In July, 1862, the congress of the United States passed "An act donat-" ing the public lands to the several states and territories which " may provide colleges for the benefit of agriculture and the " mechanic arts." A certain proportion of the public lands was in and by this act donated to the different states for the purposes above expressed, but to such donation or grant there were attached several conditions, among which were these :

(*a*.) The lands should be selected in the state making the selection, if there were public lands enough within it to permit it, if not, the secretary of the interior was directed to issue to each of the states land scrip to the amount in acres for the deficiency, which scrip was to be sold by the state and the proceeds thereof to be applied to the uses and purposes prescribed in the act, and for no other use or purpose whatever.

(*b*.) In no case should any state, to which land scrip was issued, be allowed to locate the same within the limits of any other state or territory in the United States, but their assignees might locate it upon any of the unappropriated lands of the United States.

(*c*.) All expenses of management, superintendence and taxes from the date of the selection of lands previous to their sale, and all expenses for the management, etc., of the moneys received from such sales, were to be paid by the state, so that the entire proceeds of the sales of the lands should be applied to the purposes named.

(*d.*) All moneys derived from the sale of the lands by the states to which they were apportioned, and from the sales of land scrip, were to be invested by the state in stocks of the United States or of the states, or some other safe stocks, yielding not less than five per cent upon the par value of such stocks, and the moneys so invested were to constitute a perpetual fund, the capital of which should remain forever undiminished, and the interest of which should be inviolably appropriated by each state to the endowment and maintenance of at least one college where, among others, agriculture and the mechanic arts should be taught.

(*e.*) If any portion of the invested fund, or any portion of the interest thereon, should by any action or contingency be lost or diminished, it was to be replaced by the state to which it belonged, so that the capital of the fund should remain forever undiminished, and the annual interest should be regularly applied without diminution to the purposes mentioned in the act. To these conditions the state was required to give its assent by legislative act, and the grant was only authorized upon the acceptance of them by the state.

Any state taking the benefit of the provisions of the act was required to provide, within five years, at least not less than one college as provided in the act. This state, by an act passed May 5, 1863, duly accepted the grant and gave its assent to the conditions thereof. The comptroller was authorized to receive the land scrip (as the state had no public lands of the United States unappropriated within its borders), and to sell the same and to make all necessary arrangements, employ agents, etc., as he deemed expedient for effecting a judicious sale of such scrip. Land scrip representing 989,920 acres of land was then issued by the secretary of the interior to the comptroller, and was embraced in 6,178 pieces of scrip for 160 acres each. The comptroller sold about 76,000 acres at the rate of eighty-five cents.

In 1865 the legislature chartered Cornell University, as a compliance on the part of the state with one of the conditions upon which it received the land scrip, and in the charter the

income, revenue and avails which should be received from the investment of the proceeds of the sale of the land scrip were appropriated to the university, and were to be paid over to the trustees thereof for its use and for the purposes defined in the act of congress. This gift, however, was upon the condition that Ezra Cornell should give $500,000 to the university and $25,000 to the trustees of Genesee College at Lima, in this state. Both gifts were made by Mr. Cornell.

Congress having donated this immense amount of land, upon the conditions named in the act, and the state having accepted such gift upon the conditions named, and having received the scrip and incorporated the university, and appropriated to it the income arising from the interest on the proceeds of the sales of such scrip, and the university having received the gift of half a million from Mr. Cornell, the great question then arising was in regard to the best means of disposing of such scrip for the best price, so that the income for the university should be increased to the greatest extent therefrom. The result of throwing into market such an enormous amount of the public lands as had been donated by congress to the several states was a fall in the market-value of the land, and, of course, of the scrip which represented it. In the fall of 1865 Mr. Cornell had purchased some scrip of the comptroller, representing 100,000 acres for $50,000, and had given his bond for that sum upon condition that all the profits which should accrue from the sale of the land should be paid to the Cornell University. In this condition of matters the legislature passed an act (April 10, 1866) which is as follows: ·

" SECTION 1. The comptroller is hereby authorized to fix the price at which he will sell and dispose of any or of all the lands or land scrips donated to this state by the United States of America, by act of congress approved July second, eighteen hundred and sixty-two, and entitled 'An act donating public lands to the several states and territories, which may provide colleges for instruction in agriculture and the mechanic arts.' Such price shall not be less than at the rate of thirty

cents per acre for said lands. He may contract for the sale thereof and sell the same to the trustees of the Cornell University. If the said trustees shall not agree with the said comptroller for the purchase thereof, then the commissioners of the land office may receive from any person or persons an application for the purchase of the whole or any part thereof at the price so fixed by the said comptroller, and may, if they are satisfied that the said person or persons will fully carry out and perform the agreement hereinafter mentioned, sell the same, or any part thereof, to the said person or persons. But said trustees, or such person or persons, shall at the same time make an agreement and give security for the performance thereof to the satisfaction of the comptroller, to the effect that the whole net avails and profits from the sale of scrip, or the location and use by said trustees, person or persons, of the said lands, or of the lands located under said scrip, shall from time to time, as such net avails or profits are received, be paid over and devoted to the purposes of such institution or institutions as have been or shall be created by the act chapter five hundred and eighty-five of the Laws of eighteen hundred and sixty-five of the state of New York, in accordance with the provisions of the act of congress hereinbefore mentioned. And the said trustees, person or persons to whom the said lands or scrip shall be sold, shall report to the comptroller, annually, under such oath and in such form as the comptroller shall direct, the amount of land or scrip sold, the prices at which the same have been sold and the amount of money received therefor, and the amount of expenses incurred in the location and sale thereof.   .

" § 2. The comptroller is authorized, from time to time as he shall see fit, to make such examination into the actions and doings of his vendees of said lands or scrip therewith as he shall deem necessary to ascertain and determine what are the net avails of the said lands or scrip from the sale or from the location and use thereof by his said vendees.

" § 3. This act shall take effect immediately."

Under this act the comptroller fixed the price of the land at fifty cents per acre, which, under all the circumstances, was considered a fair amount.

The trustees of the university did not apply to purchase the scrip under the act of 1866, and on the 4th of August, 1866, the commissioners of the land office made an agreement with Ezra Cornell for the sale to him of all the remaining scrip undisposed of, represented by 5,087 certificates of 160 acres each.

The agreement was entered into between the commissioners and Mr. Cornell, under the authority of the above-quoted act of 1866, and as the decision of the question turns to a large extent upon the proper construction and meaning of this agreement, it is thought better, although the agreement is quite long, to insert it in full so the whole force and effect of the same may be observed.    It is as follows :

" This agreement, made this fourth day of August, eighteen hundred and sixty-six, between the people of the state of New York, through their commissioners of the land office, acting under and by virtue of chapter 481 of the Laws of 1866, of the first part, and Ezra Cornell, of Ithaca, New York, of the second part, witnesseth : That the said party of the first part hereby agrees to sell and assign and deliver to the party of the second part, all of the agricultural land scrip now in the possession or ownership of the state of New York, consisting of five thousand and eighty-seven certificates, each representing one hundred and sixty acres, on the following terms and conditions :

"*First.* That said party of the second part shall receive said scrip from time to time, as the same can be judiciously located, in parcels representing not less than twenty-five thousand acres, paying therefor into the treasury of the state, on its assignment and delivery to him by the comptroller, at the rate of thirty cents per acre, in lawful money of the United States, or of the state of New York, or in other good and safe stocks or bonds, to be approved by the comptroller, and drawing not less than five per cent interest per annum, and at the same time depositing with the comptroller stocks or bonds to be

approved by him, to an amount equal to an additional thirty cents per acre, as security for the fulfillment by the party of the second part of the conditions of this agreement, so far as they relate to the execution of a mortgage to the state on the land to be entered and located with said scrip, on the fulfillment of which, said stock or bonds, so deposited as security, shall be returned to said party of the second part.

"*Second.* That whenever any parcel of scrip sold and delivered to the said party of the second part, under and by virtue of this agreement, shall have been located by him or his agents, the said party of the second part hereby agrees that he will without delay furnish to the commissioners of the land office of this state, or to some member thereof to be designated by a resolution of the board, a full and complete list and description of the land so located. And the said board of commissioners shall within at least sixty days thereafter, and from time to time subsequently as may be found expedient, fix a minimum valuation by quarter sections, at which the same may be sold by said party of the second part. And said party of the second part further agrees that he will annually, and from time to time whenever required by the commissioners of the land office, render for their information to the comptroller a full, just and true account of all sales and leases made by him, said report to be made in such form and under such oath as the comptroller shall direct, and will pay into the treasury of the state the whole of the net profits arising therefrom, which shall be ascertained by deducting from the gross receipts on sales the original cost of thirty cents per acre, the cost and expenses attending the location, management and sale of said lands, the taxes assessed and paid on the same by the party of the second part, and the interest at the rate of seven per cent per annum on the several amounts actually expended and liabilities incurred for such purposes. But it is expressly agreed by the party of the second part that he will not sell any portion of said lands at a price below the minimum valuation thereon, which may

from time to time be fixed by the commissioners of the land office, without first obtaining their consent to do so in writing.

"*Third.* That the stipulations and conditions of this agreement shall apply to each and every parcel of scrip assigned and delivered to said party of the second part under this agreement, and the comptroller shall defer or suspend further assignments and deliveries of scrip whenever the party of the second part fails to perform such stipulations and conditions in respect to any scrip sold and delivered to him under this agreement until they have been complied with. Except, nevertheless, that stocks or bonds as security for the return and mortgage of lands located under scrip to the party of the second part, shall in no case be required when there shall remain in the hands of the comptroller, by virtue of this agreement, mortgaged lands not released equal in quantity to the scrip which may be issued to the party of the second part, and remain not located and mortgaged as provided by this agreement.

"*Fourth.* That as often as and whenever the party of the second part shall furnish a description of any of the lands selected and located by him under and by virtue of said scrip, he shall immediately execute a mortgage thereon to the people of this state to be approved by the attorney-general, conditioned that the said party of the second part will fully keep and perform each and every of the terms and conditions he is required to do, keep and perform. And this agreement is declared to be a continuing agreement, and a suit or suits at law or in equity may be from time to time instituted and maintained thereon, and upon any or all of said mortgages, for any violation of such terms and conditions, whenever such violation may occur. Said mortgages shall be delivered to the comptroller or to the commissioners of the land office.

"*Fifth.* Whenever the party of the second part shall sell or dispose of any section of the lands acquired by him under this agreement and pay into the treasury of the state the net profits resulting from such sale, after the deductions hereinbefore mentioned and provided for, the party of the first part

shall execute and deliver to the party of the second part a full and sufficient release of the portion sold from the lien of the mortgage, so that a clear title can be vested in the purchaser or purchasers.

"*Sixth.* That of the moneys arising from sales or leases made by the party of the second part, and paid into the state treasury as herein provided, a proportion equal to thirty cents. per acre shall be added to and form a part of the fund known and designated on the records of the comptroller's office as the " College Land Scrip Fund," and the remainder shall constitute a separate and distinct fund, *which shall be the property of the " Cornell University," to be known as the " Cornell Endowment Fund,"* the principal of which shall forever remain unimpaired, the income to be annually appropriated by the legislature, and paid over from time to time to the trustees of the Cornell University, to be by them devoted to the purposes of the institution.

"*Seventh.* That the said party of the second part further agrees to purchase the whole of the aforesaid scrip, and select and locate lands under and by virtue thereof, and execute mortgages thereon, as hereinbefore provided, within four years from the date hereof, and that he will sell the lands within twenty years from date, and pay the net profits arising from such sales into the treasury of the state, and that until the same shall be sold and the net profits so paid, he will pay all taxes which may be assessed thereon, and preserve and maintain a title thereto unimpaired, to which the liens created by said mortgages shall attach.

"And if any event shall occur making it needful for the people of this state to incur any expense to preserve the lien of said mortgages, the same shall be paid out of the proceeds of said lands. And if, after the expiration of the period of four years hereinbefore fixed, any of said scrip shall remain with this state; and not have been paid for by the party of the second part, the same shall be released thereafter from the conditions and stipulations of this agreement."

There was no sum provided in the act of congress for the sale of the scrip. It was in the discretion of the state to sell it at any price it could obtain either at public or private sale ; and it could sell the whole or any part of such scrip at any time, but the proceeds of such sale were to be invested under the act of congress and the income applied as therein provided for. If there be any ambiguity in the meaning of the agreement as a whole, it is not improper to see what meaning was attached to it by the persons who executed it, if possible, and also to look at the surrounding facts so that we may place ourselves in the same position as the contracting parties and thus learn what was in contemplation. It is known that at the time of the passage of the act of April 10, 1866, sales of the scrip had almost ceased.

It was thought that there was a good chance that the land which might be located under this scrip would, in the future, greatly appreciate in value, and it was the wish of those interested in its welfare that the university should, in some way, reap the benefit of this increase. But it had no funds to purchase the scrip, and it needed ready money as an income to aid it in the discharge of its duties as an educational institution. Hence the problem was to find some one who would purchase the scrip and pay for it and then locate and sell the lands at the higher prices which it was hoped they would attain and give the profits to the university. A glance at the correspondence between Mr. Cornell and the comptroller, and at the minutes of the proceedings of the land commissioners, and the other evidence in the case, shows that there was no one else than Mr. Cornell who was ever thought of as a person who would take upon himself such burdens, troubles, labors and responsibilities for the purpose of giving away all the profits which might, in the future, arise from such sales. It is seen by reference to that correspondence that Mr. Cornell and the comptroller differed in regard to the construction of the act, the comptroller holding that the act really meant that the net avails of the scrip should be placed under the custody of the state, while it may be inferred that the idea of

1888.]          MATTER OF McGRAW.          123

Opinion of the Court, per PECKHAM, J.

Mr. Cornell was that the *profits*, after paying the original thirty cents, and the additional thirty cents (if realized) as the purchase-price of the scrip, might be placed as he should choose, provided the university should receive the benefit of the whole income arising from such profits. Under date of June 9, 1866, Mr. Cornell, in his letter to the comptroller, speaks of his differing with the comptroller in his construction of the law, but adds : " Appreciating, as I do most " fully, your motives for desiring to give the utmost possible " security and permanency to the funds which are, in a great. " degree, to constitute the endowment of the Cornell Uni- " versity, I shall most cheerfully accept your views so far as to " consent to place the entire profits to be derived from the " sale of the lands to be located with the college land scrip in " the treasury of the state, *if the state will receive the money* " *as a separate fund from that which may be derived from* " *the sale of scrip and will keep it permanently invested and* " *appropriate the proceeds from the income thereof annually* " *to the Cornell University, subject to the direction of the* " *trustees thereof, for the general purposes of the institution,* " *and not to hold it subject to the restrictions which the act* " *of congress places upon the fund derivable from the sale* " *of the college land scrip or as a donation from the govern-* " *ment of the United States, but as a donation from Ezra.* " *Cornell to the Cornell University.*"

Mr. Cornell thus plainly understood that the purchase-price of the scrip from the state was thirty cents an acre, with a. possible thirty cents more if he should realize that sum on the. sale of the land, and that any sum beyond that came to him as profits on his sale of the scrip or land to third parties, and that sum, being his own profits, he was willing to donate to the. university, and for that purpose to pay the same into the treasury of the state, the same to be invested and the income therefrom to be paid by the state to the university for the general purposes of the institution, and not as part of the purchase-price of the scrip to be invested under the act of congress. It was after the receipt of this letter that the.

agreement was made, the subdivision (six) containing, in substance, the provision asked for by Mr. Cornell.

While in some portions of this agreement, if read alone and laying aside all knowledge of the contemporary history of the events surrounding it, there might arise some doubt as to the meaning of such portion, yet when read as a whole, and in the light of those events, I think no real and grave doubt can exist as to the meaning of this instrument. It seems clear to my mind that the state sold this land scrip at thirty cents per acre, with an additional thirty cents if so much should thereafter be realized upon the sale by the vendee of the state, and that this constitutes the purchase-price of such scrip, which when assigned to Mr. Cornell by the state, in accordance with the terms of the contract, he became the legal owner of. He, it is true, also agreed that his profits should be paid into the treasury of the state, but they were to be paid therein *as profits*, and not as any portion of the purchase-price of the scrip, and they were to be paid, and were in fact paid, as profits of Mr. Cornell, and they were received under that agreement as the property of the Cornell University, the income of which was to be paid to it for its general purposes, and the principal was to constitute the Cornell endowment fund. I cannot see that in all this there was nothing but an agency created in behalf of the state, and that Mr. Cornell was such agent, and that the whole profits realized were really nothing but the proceeds of the sale of the lands by the state. The state, on the contrary, by the very terms of the agreement sold the scrip, and the legal title, by patents from the government of the United States, was vested in Mr. Cornell when he located the lands under the scrip which he had purchased, and took out his patents upon such location. Neither can I see that the purchaser of the scrip gave or intended to give or was supposed to give his profits as part of such purchase-price. His agreement is plain, and in it he stated what such purchase-price was, and what he would give for the scrip, and the fact that he agreed to pay his profits, if any were realized, into the treasury of the state, as the property of the

university, which was to have the income thereof paid over to it for its general purposes, does not, to my mind, render such profits any portion of the purchase-price of the scrip. They were profits which he hoped to be able to realize in the future, but were entirely speculative in character and amount, dependent largely upon the judgment with which the lands were located, and the time and manner of their sale. All this Mr. Cornell was willing to do for this university, but the agreement shows that he was to do it as a gift of his own, and not as a mere agent of the state or of the United States; and that. all the compensation he sought for his services, his trouble and his responsiblities, great and onerous as they were, was the fact that all this should go to the university as his gift, and the state became the custodian of the profits under a duty to appropriate the income to the trustees for the general purposes of the university.

The counsel for the institution may be entirely right in his statements as to the law regarding this branch of the question, if he is right in the fundamental proposition as to the *profits* being a part of the purchase-price or the avails of the sale of the scrip by the state ; but until he can maintain the correctness of that proposition, I .do not think his argument reaches the trouble. I do not think the proposition is correct. The profits were the avails of the sale of the scrip by Mr. Cornell, not in any sense the avails of the sale of the scrip by the state. I think, also, that the agreement is fully authorized by the act of April 10, 1866. It gives the right to the commissioners of the land office to sell the scrip or any part thereof for the price which was to be fixed by the comptroller, and not less than thirty cents per acre. The right to sell the scrip at the price fixed by the comptroller was based upon the condition that the persons who purchased at such price should also agree to pay over the net avails or profits from the sale by them of the scrip or lands located under it, as they should be received, and that they should be " devoted to the pur- " poses of such institution or institutions as have been or shall " be created by the' act chapter 585 of the Laws of 1865 "

(the charter of Cornell University), in accordance with the provisions of the act of congress before mentioned. This does not mean that all these possible profits are to be deposited in the state treasury, subject to the same rules that would obtain in the case of the purchase-price of the scrip, but only that they shall be devoted to the institution created by the act of 1865, in accordance with the provisions of the act of congress already mentioned. Of course the purchase-price — that which was fixed by the comptroller — was to go into the treasury and be invested as provided for by the act of congress.

The reference in the above section of the act of 1866 to such institution or institutions as has been or shall be created by the act chapter 585 of the Laws of 1865, can, of course, be to none but the Cornell University, and hence the provision in the agreement that the profits shall all be devoted to that institution was proper. As that university had complied with all the conditions imposed upon it by the state as a condition to its right to receive all the income from this fund, the right to it could not be taken from it. This the commissioners of the land office stated in their report to the constitutional convention in answer to a request from that body for information as to this land scrip. And in this report, under date of July 22, 1867, the comptroller, as a member of the board of commissioners of the land office, and one of the officers who executed the contract with Mr. Cornell in August, 1866, stated as follows: " In deciding what portion of the income " of the money paid into the treasury under the agreement " with Mr. Cornell would be subject to this limitation " (set forth in the act of congress) " as to its use and application, " the commissioners of the land office assumed that the pro- " hibition applied only to the ' purchase-money received by " the state on a sale of the scrip,' and that the ultimate profits " to be derived from the location and sale of the lands by the " purchaser formed no part of the purchase-money, and need " not, therefore, be included. The nominal price which was " fixed on the scrip by the act of 1866, and for which it

" was sold, in consideration of the stipulation to pay over the
" net profits, being less than the market rates, it was stipulated
" in the sixth section of the agreement that an additional
" thirty cents per acre from the net profits should be added to .
" the purchase-money, thus increasing the price to sixty cents
" per acre, the current rate for the scrip at the date of the
" transaction, and limiting the purposes to which it may be
" applied in conformity with the terms of the grant by
" congress."

Here, then, in addition to the language as used in the agree-
ment itself, which, when read as a whole, seems to me quite
plain, we find what Mr. Cornell was willing to do as set forth
in his letter to the comptroller above quoted from, in which
he claims the act permitted it, and he would donate the profits
as a gift from himself to the university; and we find in an
official report of one of the officers executing the contract,
speaking for himself and associates, what was their under-
standing of this agreement.   From all sources, the agreement
itself, and the separate views of the parties to it, it appears
the construction should be, and was, that the profits formed no
part of the purchase-price or the avails of the sale of the
scrip by the state (over the thirty cents per acre if realized),
and that such profits belonged to the university by the gift
of Mr. Cornell, the vendee of the scrip from the State, the
income to be paid to the trustees of the university for the
general purposes of the same.

In 1868, by chapter 554, the legislature authorized the
comptroller to invest the moneys comprising the Cornell
endowment fund in securities which were not authorized by
the act of congress, provided such moneys formed any part
of the purchase-price or avails of the sale of the scrip by
the state.

This must be taken as a legislative recognition of the fact
that the agreement of sale to Mr. Cornell was for thirty
(possibly sixty) cents an acre, and that all profits belonged to
Mr. Cornell, but that by an agreement he had agreed to give
them to the university for the general purposes thereof.   We

cannot assume that the state would have run counter to the express provisions of the act of congress by enacting that the purchase-price of the scrip might be invested in a manner forbidden by that act.

The commissioners appointed under a joint resolution of the legislature of 1873 reported (two out of three), that the profits formed part of the purchase-price of the scrip, the third commissioner, Horatio Seymour, not concurring and being of the contrary opinion.

The legislature took no action then upon the subject, but by the act (chap. 317 of the Laws of 1880), it directed the comptroller, upon the request of the Cornell University, to transfer to it all moneys, securities, etc., constituting a part of the Cornell endowment fund, pursuant to which act the fund was transferred to it. This was done because the university, under an agreement made with Mr. Cornell in 1874, with the consent of the comptroller and the commissioners of the land fund, had placed itself in the shoes of Mr. Cornell, so far as the contract with the state was concerned, and Mr. Cornell had conveyed to it all his right and title to the scrip, the lands located under it, and all land contracts existing. This was done at the wish of Mr. Cornell, who desired the university to take the further work under the contract, and the responsibility arising therefrom, and the university has paid to the state a portion of the amount coming to it as the purchase-price (the additional thirty cents realized) for the sale of some of the lands.

These are the material facts upon which the question discussed arises, and thus the two bodies, the state and the university, stood at the date of the commencement of these proceedings, and thus they stand now. The state has made and makes no claim that any portion of these profits over the thirty cents an acre forms any portion of the purchase-price of the sale of the scrip by it. The university, by its agreement with Mr. Cornell and by taking exactly his position, and by receiving the moneys and securities of the Cornell endowment fund by virtue of the act of 1880, clearly has taken the position

that it was the owner of this fund, and was not indebted to the state therefor. Its reports show that they (the trustees of the university) claimed that it had no debts, and they acknowledged none to the state on account of this fund.

If it existed, it would certainly be a somewhat onerous position for the state to be in. It must have all the proceeds of the sale of this scrip, including in such case all the profits of the past and what may hereafter arise; it must pay all expenses, etc., after location, in the way of taxes, and all incurred in the management and disbursement of the moneys, and must invest in stocks of the kind described in the act of congress, and must forever guarantee the whole amount, so that if any of the principal is lost, it must be supplied by the state, and it must pay over the five per cent interest on the whole of this fund to the university. This, of course, does not weigh in case the decision were that the law is in that condition. For the reasons already given, I do not think it is. Interpreted as we have interpreted the agreement and the act of the legislature of New York, the remaining inquiry is, does the New York statute, or the agreement under it, run counter to the act of congress creating this land scrip trust? I think not. It provides that all moneys derived from the sale of the land scrip by the state shall be invested, etc., as therein prescribed. The scrip is to be sold by the state, which could not itself locate the land, and the avails of such sale are to be invested. The avails of the sale of the scrip by the state were the purchase-price thereof; and if I am right, that the profits formed no part of such purchase-price, but were the property of the vendee of the state, which *he* agreed to give to the university for general purposes, as his gift and to form the property of the university, then the act of congress has no concern with it.

Another consideration may be adverted to.

It is exceedingly doubtful, in my mind, whether the university can be heard to claim the existence of this alleged debt under the facts of this case. The state has made, and makes,

no claim upon the university for the property or any portion of it. It was placed in its possession by virtue of the consent of the state, evidenced by the passage of an act authorizing and directing it. The university has claimed to be the owner of it, and no one has drawn its rightful title in question. Can it now, while enjoying, without hostile claim from any source, the full control of the property, as its absolute owner, set up, as a reason why it should be allowed to take other property, that perhaps hereafter some one may make a claim that the property does not belong to the university, but that it is a trust fund originating in the act of congress? If the state or United States were to commence some proceeding, based on the counsel's argument, to reclaim possession of the property, there is nothing in the present attitude of the university which would necessarily estop or in any way conclude it from denying that any such trust exists, or that any case had been made for taking the possession of the property out of its hands. So far as appears, it seems that this assumed indebtedness is entirely gratuitous on its part, and that there is no creditor who makes the claim, no one who questions its title. It is going a good ways, under such circumstances, to lay much weight on a liability which, up to this proceeding, was never admitted by the university, and is not now asserted by any one else. It would seem as if property, which was thus in the possession of the corporation, unclaimed by any one else, was held by it within the meaning of its charter, and that the question in regard to the character of its holding was merely an abstract one with which courts would not deal, at least so far as this proceeding is concerned.

In all these matters it must be borne in mind the parties have all been acting in the most entire and perfect good faith. This was no scheme to avoid or evade the provisions of the act of congress. The price of sixty cents an acre which the state got for the land was all it was worth at that time. Its future value depended upon many contingencies. The state had the right to sell the scrip for such price as it might agree on with a purchaser. This it did. The university wanted

money to pay its expenses. It could not very well wait for twenty or even five years for the purpose of seeing how the value of this scrip would appreciate, if at all. The legislature was equally in earnest in its desire for the prosperity of the institution; so were the state officers, and, above and beyond all, so was Mr. Cornell, its generous founder and already the donor of such a large amount of money. Taking all the circumstances into consideration, the plan carried out was hit upon, and the amount of the Cornell endowment fund and the property arising therefrom must be regarded as a gift of the donor and founder, and not as a violation of either the act of congress, or of the act of our own legislature.

The agreement being valid and authorized by our state law, which was not in conflict with the law of congress, the position of the university with regard to property must now be adverted to.

The university stands in this position, counting the two items of western lands and land contracts as its property:

| | |
|---|---:|
| Funds from individuals ................... | $598,588 65 |
| Western lands ......................... | 1,648,178 56 |
| Western land contracts.................. | 439,334 22 |
| | $2,686,101 43 |

In the first item, however, is included the university buildings, farm, grounds, etc., as fixed by the surrogate, at $69,683,33. The General Term advances those figures by $315,316.67, making the valuation $385,000. Adding $315,316.67 to the $2,686,101.43, we have a total of $3,001,418.10, without counting the college land scrip fund in the hands of the state as property.

We agree with the General Term in the modifications made by it in the value of the university buildings and grounds, although we are probably bound by its findings, as there was contradictory evidence in regard to it.

This brings the property of the university, above set forth,

up to more than its permitted aggregate at the time of the decease of Mrs. Fiske, and no debts to be deducted therefrom.

Under such circumstances, the university could not take the various legacies bequeathed to it by her will.

The judgment of the General Term should, therefore, be affirmed, with costs.

All concur, except FINCH, J., taking no part.

Judgment affirmed.